**GROVE PRESS, INC., Editions Gallimard et Cie, Jean Genet and Bernard Frechtman, Plaintiffs,**

v.

**The GREENLEAF PUBLISHING COMPANY, Reed Enterprises, Inc., New-Cal Publications, Inc., G. I. Distributors, Inc., William L. Hamling and Frances Hamling, Defendants.**

No. 65-C-677.

United States District Court
E. D. New York.

July 21, 1965.

See also, D.C., 247 F.Supp. 518.

Ginsberg, Schwab, & Goldberg and Richard T. Gallen, New York City, for plaintiffs; Morton David Goldberg and David E. Schwab, II, New York City, of counsel, on the brief.

Greer Maréchal, Jr., New York City, for defendants.

ROSLING, District Judge.

On July 9, 1965 plaintiffs commenced this action upon a claim of copyright infringement against defendants. On the same day an order to show cause, returnable July 14, was issued upon plaintiffs' application which sought an interim direction restraining defendants in the usual form against infringement pendente lite. The order to show cause submitted ex parte directed that upon plaintiffs giving security in the sum of $10,000 for costs and damages the interim restraint be immediately effective, expiring, however, on July 14th unless further extended by the court.

The application was heard on the return day and was further argued on July 16th at which time the matter was submitted for determination and the stay extended to July 21st to enable the court to review the matter and render its decision. The parties were in agreement that there is no dispute as to the facts.[1]

The original work around which the conflicting claims revolve is the book "Journal du Voleur", composed in the French language by Jean Genet and published in France in 1949. The parties plaintiff and defendant, their status and relationship to the work in its French and English versions and revisions, and the copyright registrations procured or omitted are set out in the following.

The plaintiffs are Jean Genet, the book's author, a French citizen; Bernard Frechtman, who translated the work in whole and in part into English, a United States citizen resident in France; Editions Gallimard et Cie (Gallimard), a publishing house incorporated in France with principal place of business in Paris; and Grove Press, Inc. (Grove) a New York corporation with principal place of business in the City of New York. Grove is also a publisher of literary works.

The sequence of events in which these plaintiffs participated is as follows:

On June 16, 1949, Genet's book was published by Gallimard and he appears to have complied with statutory requirements for securing to him a copyright.[2]

Prior to October 21, 1952 Frechtman, under authority and license from Genet and Gallimard, created an original English language translation of the entire volume. Five pages of such translation were for the first time published on that day, appearing with a brief foreward by Frechtman as pages 285 to 291 in a paperback book, an anthology providing specimens from the works of a number of authors, entitled "New World Writing (Second Mentor Selection)." This volume was printed in the United States and published by the New American Library of World Literature, Inc. (N.A.L.). Plaintiffs allege and defendants do not contest their claim that this

1. To complete the record, inasmuch as no minutes of the hearings were taken, defendants were permitted to submit a supplemental affidavit (subsequently filed), alleging the undisputed fact that plaintiffs' current English version of the book allegedly infringed by defendants' accused work was being distributed in paperback by Bantam to the trade. Such distribution is alleged to have been initiated after the restraint had been issued against defendants sale of its competing product. Defense counsel alleged that "Bantam's first printing was 300,000 copies—as compared with defendants' 150,000, a second printing of 150,000 having been interrupted by this restraining order." An affidavit submitted on plaintiffs' behalf by Ian Ballantine, president of Ballantine Books, Inc. and former president of Bantam as well as United

States manager of Penguin Books, Inc. alleges that distribution of defendants' books would cause irreparable damage to plaintiffs, basing this view on his experience that "[i]t is customary for a publisher to ship the bulk of his initial printing within 2 or 3 days after the printing is completed."

2. It was not, however, until July 7, 1965, that the copyright in said work was registered in the office of the Register of Copyrights in the name of Librairie Gallimard, the trade name of Gallimard. Since the date of the first publication in 1949, the plaintiffs Genet and Gallimard have been the sole proprietors of the copyright. It is alleged by the plaintiffs and not contested by defendants that all copies of the Journal du Voleur have been published in conformity with governing copyright law.

represented the first publication in the English language of any portion of the Frechtman translation.

On both a prefatory page devoted to claims of copyright as to a number of items of those comprising the contents and at page 285 where the Frechtman excerpt began, a copyright notice appeared reading "A section from the Thief's Journal Copyright 1952 by Bernard Frechtman."

Frechtman had licensed N.A.L. to publish the item in the United States. The copyright covering the translation accordingly dates from October 21st, 1952. Certificate of Registration was issued by the Register in the name of Frechtman on November 12th of the same year.

The complaint alleges that prior to 1954 Frechtman had created an original English language translation of the Journal du Voleur which he entitled "The Thief's Journal" and that such translation was copyrightable matter under the laws of the United States. Whether the 1952 excerpt was part of this text is not clear. The parties are in agreement, however, that during the year 1954 the Olympia Press of Paris published a complete English-Language translation of Journal du Voleur by Bernard Frechtman under the title "The Thief's Journal". This Paris edition contained the following copyright notice: "Copyright 1954 by B. Frechtman and the Olympia Press, Paris". The edition bore a legend on the outside of the back cover "Not to be sold in U.S.A. or U.K." [3] It is to be inferred that this 1954 edition is a revision of the complete translation from which the N.A.L. portion was excerpted. This conclusion is based on the statement made by movants in their brief that the Olympia Press Publication "includ[ed] the N.A.L. work in *revised* form." [4]

Both the plaintiffs and the defendants are in accord that no steps were taken by Frechtman, or, for that matter, by any of the other plaintiffs to comply with the copyright laws as to the 1954 translation, and that no copyright protection was secured for said translation. Although the plaintiffs have supplied as exhibits copies of the original 1949 work, the 1952 anthology containing the Frechtman excerpt, the 1964 hard cover Grove publication and the accused translation of 1965, they failed to furnish the 1954 Olympia Frechtman translation

3. The significance and legal effect of this legend is not made clear. A possible explanation may be found in the assumption that plaintiffs thereby hoped to avoid the effect of a dictum in Bentley v. Tibbals, 223 F. 247 (2nd Cir. 1915), in which the court denied plaintiff, a British subject, an injunction against alleged infringement of the text of a telegraph code published in England. A portion of the British text comprised matter which had been earlier copyrighted by the plaintiff in the United States. The defendant had copied the enlarged British version. It appeared that it was plaintiff himself who had brought the latter work into this country for sale here.

The Court of Appeals in the following language in its opinion strongly suggests that plaintiff's own conduct in importing the book into this country without clear indication as to the division of the work which was covered by the domestic copyright compelled denial of plaintiff's application for the restraint. The court wrote:

"The conclusion at which we have arrived is that the complainant is not entitled to an injunction to restrain the defendant from publishing and selling 'Bentley's Complete Phrase Code' as prayed for in the bill. We have arrived at this conclusion, not because he reprinted the matter in England without taking out copyright in that country. That he could do without impairing any of his rights in the United States. But his difficulty arises out of the facts that in his English publication of the Code he embodied the Telegraph Cyphers, or a substantial part of that work, and imported the same into the United States, and sold it here, without any notice in it by which the public could know by inspection the copyrighted from the uncopyrighted matter."

4. The court accepts this statement inasmuch as defendant does not appear to contest the claim. The court does not find affidavit support thereof in any of the moving papers.

published abroad. Nor have the defendants whose publication is agreed by all concerned to be a photocopy of Olympia's edition supplied the deficiency.

On November 16, 1964 Grove published a hard cover volume with a preface by Jean Paul Sartre. Plaintiffs allege that this was a "completely revised" [5] Frechtman English translation composed by him prior to such publication date. It was entitled "The Thief's Journal" and constituted copyrightable material.

That full compliance in respect of the 1964 revision was rendered to the copyright laws by Frechtman and Grove so that copyright protection of such revised translation was gained, is not controverted by the defendants. From November 16, 1964, alleged by plaintiffs to have been the date of the first publication by Grove, that publisher has "printed, bound and published" the work in conformity with governing copyright law.[6]

Genet had granted Grove on October 19, 1959 an exclusive license for publication in the United States and Canada of Frechtman's revised translation in volume form in the English language. On January 26, 1965 a registration certificate had been procured by Grove which continued the proprietor of the copyright and rights therein until February 17, 1965 when Grove assigned the copyright to Genet. Since that date Genet has been the proprietor of the copyright.

In November 1964 Grove issued a license to Bantam Books, Inc. (Bantam) conferring upon it sole and exclusive paperback publishing rights in The Thief's Journal in the United States and Canada. Bantam obligated itself for the license to pay an advance against royalties in the sum of $50,000. The scheduled publication date is November of this year.

It is against the foregoing background of personalities and events that we turn now to a consideration of the defendants and their involvement in the controversy. Defendant Greenleaf Publishing Co. (Greenleaf) is the publisher of the accused edition and defendant New-Cal Publications, Inc. the printing concern employed by Greenleaf to print it; defendants Reed Enterprises, Inc. and G. I. Distributors, Inc. are distributors of the work. Finally, the defendants Ham-

---

5. According to plaintiffs the material was new, constituting a complete revision. The defendants' position is ambivalent. On the one hand defendants set out in parallel columns a collation of variant readings, one set drawn from defendants' Greenleaf Classic edition, which, being a photocopy, is in consequence a verbatim reproduction of the 1954 Frechtman translation (Olympia Press), and the other from the Grove revised revision of 1964. "As a result of this comparison" the defense attorneys who made it report "more than 1350 instances of differences or changes or additions or deletions as between these two editions" are found, which average five per page. This, so defendants' argument further runs, indicates that defendants have copied nothing more than that which was in the public domain (Olympia, 1954), and have not despoiled the new and original 1964 Frechtman-Grove product.

When it suits their purpose to do so, however, defendants, themselves publishers of experience, knowingly hint that the 1964 redaction was not a sincere search for the mot juste, but rather changes contrived for changes' sake, and calculated to impress the readership in the copyright office that what it was reviewing had so far departed from the original earlier text that the later work was entitled to recognition as new original work and a copyright to date from the day of the latest revisions.

The court's own examination, to the extent that time pressures permitted, of lexical and structural variorum, leaves it in doubt as to plaintiffs' purpose and the legal effect of the latest Frechtman recension.

6. The Grove edition was a hard cover volume which bore on its flyleaf the following copyright notice:
"Copyright © 1964 by Grove Press, Inc. All Rights Reserved
Originally published by Librairie Gallimard in Paris, France under the title Journal du Voleur, copyright © 1949 by Librairie Gallimard."
The United States Copyright Office duly registered the work and issued its certificate in the name of Grove on January 26, 1965.

ling are officers who control Greenleaf's operations.

The accused paperback is entitled "The Thief's Journal by Jean Genet" with a foreword by Jean-Paul Sartre. The book carries an announcement on its cover that it is the "First *Authentic* American Edition of the French Text". On a flyleaf appears the notice "special contents this edition copyright, ©, 1965 by The Greenleaf Publishing Company." No subterfuge is resorted to to conceal the provenance of the work. Defendants admit that it constitutes a photographic copy of the 1954 Olympia English translation which had been published in France with only the French copyright claimed for it. Defendants contend, however, that such copyright notice on the Olympia edition did not secure copyright protection in this country for such English version. Plaintiffs' position to the contrary is that "although violation of copyright on the Olympia edition is not urged upon the plaintiffs' motion for preliminary injunction, plaintiffs have at no time conceded any invalidity of the said copyright."

Plaintiffs' memorandum in support of the motion, moreover, declares that "plaintiffs found their claim for relief upon three copyrights, registration certificates for which were issued by the United States Copyright Office as follows:" These are listed as

(1) the original Journal du Voleur in French copyrighted in 1949 by appropriate notice with registration certificate obtained in the United States evidencing the domestic copyright on July 7, 1965;

(2) the 1952 excerpt published in the N.A.L. anthology and copyrighted the same year; and

(3) the "completely revised" Frechtman English translation of The Thief's Journal copyrighted by Grove in 1964.

It thus appears that plaintiffs do not upon this application for a temporary injunction rely in any sense upon the copyright (French) secured by the Olympia Publication in 1954. At its farthest reach the plaintiffs' position with respect to the Olympia edition is a defensive one serving to repel the assertion by defendants that the Olympia Publication had the effect of diluting or dissolving copyright protection which the plaintiffs derive by virtue of the three registrations just noted.

Plaintiffs' position is even further contracted by the repeated statement of their counsel made in open court both spontaneously and also in response to the court's question put to him upon the argument of the motion for a preliminary injunction, as to what he alleged were the muniments of the copyright title upon which the plaintiffs grounded their asserted right to copyright protection against infringement. Counsel's answer was that the copyrighting in the United States in 1952 of the few pages of the Frechtman translation constituted such basis.

Why the attorney thus constricted his position and why, additionally, he chose to disregard the 1949 copyright of the French version in this country for possible support, he failed to explain though urged to do so by the court. His memorandum of law declares in this connection that "[f]or the purposes of the instant motion * * * plaintiffs' right to an injunction, *pendente lite* is sufficiently shown by the defendants' infringement of the copyright on the N.A.L. work, but without prejudice to the plaintiffs' rights and remedies with respect to the infringement of their other copyrights." At a later point in the same memorandum the following statement appears: "The only issue before the court on this motion is whether the republication of the N.A.L. work (excerpt is clearly intended) in the Olympia edition in any way impaired the continuing enforcement of the copyright on the N.A.L. work. Plaintiffs submit that it did not and that the copyright is valid and infringed."

While the legal questions posed are not susceptible of certain answers, certainty is not required to entitle plaintiffs to the interim relief they seek. That the

N.A.L. fragment of the Frechtman 1952 translation was copyrighted cannot be gainsaid. That the effect of such protection was dissipated by later events abroad, namely, the publication of the Frechtman revision in 1954 with only the French copyright notice is a thesis which the court finds lacking in judicial support.[7]

Plaintiffs rely heavily on Bentley v. Tibbals (see fn. 3 for citation and discussion of content) as sustaining their contention that the 1952 excerpt by virtue of its independent copyright status imports its protection into, and confers it upon, a larger work (Olympia) with which as an unidentified fragment it is incorporated. Here plaintiffs five N.A.L. pages comprised no more than 2% of the entire work.[8] Plaintiffs' confidence in Bentley as a supporting authority is, however, misplaced. The court finds defendants' analysis of the holding in that case more nearly in accord with what was therein determined.

In Bentley the later and larger code book "contained a substantial amount of the 'Cyphers,' [the earlier work copyrighted in the United States] together with additional matter, and secured for that work a British copyright, on the title page of which appeared the following statement: 'This Code includes the Telegraph Cyphers entered according to act of Congress in the year 1906, by E. I. Bentley in the Office of the Librarian of Congress at Washington, D. C. All rights reserved. Entered at Stationer's Hall.'" Tibbals, the defendant in the Bentley case, had without receiving authority from the plaintiff to do so, copied the text of the English volume, and had thereafter sold code books containing it in the United States. Through such disposition he was of course at the same time selling the included portion which, as a separate unit, the United States copyright covered. Defending against Bentley's charge of infringement, Tibbals argued that he "had a perfect right to copy an uncopyrighted [i. e. in the United States] book, and the complainant, by importing into this country [the English volume] and by selling it here, lost his right to be protected in this country on anything which it contained; that the publication of parts of a copyrighted book as parts of an uncopyrighted book involves an abandonment of the copyright."

The court, considering Tibbals' contention, noted that the importation and sale of the uncopyrighted English work "was the act of [the] owner. Bentley,

---

7. United Dictionary Co. v. G. & C. Merriam Co., 208 U.S. 260, 28 S.Ct. 290, 52 L.Ed. 478 (1908); Bentley v. Tibbals, 223 F. 247 (2d Cir. 1915); Harper & Bros. v. M. A. Donohue & Co., 144 F. 491 (N.D.Ill.1905), aff'd without opinion 146 F. 1023 (7th Cir. 1906).

8. Plaintiffs' situation possesses less strength than the above textual comment would indicate. Plaintiffs have not, as the court has earlier remarked, provided it with a copy of the 1954 Olympia edition. Defendants in the course of the argument of the motion for their part informed the court that their copy had been substantially destroyed in the process of producing the accused Greenleaf version. The latter, being a purportedly photographic copy, must, accordingly, serve for our present limited purpose as the equivalent of the absent prototype.

A collation of what is included in the N.A.L. anthology as pages 286 through 291 with its Greenleaf counterpart, pages 220 through 230 thereof, discloses, according to defendants, that there are "136 instances of changes or revisions made by plaintiff Frechtman himself in the five page version before publishing the Olympia Press edition—an average of more than 27 changes per page, which * * * are instances of change or addition or deletion, not merely in that 136 words were changed. Whether or not 136 sounds like a large or small number, the fact remained that plaintiff Frechtman literally rewrote the five 1952 pages when he published the 1954 complete work."

The court has not troubled to check defendant's count for its accuracy, but acknowledges that the changes are obviously quite numerous, and, indeed, in two instances the 1952 version omits entire pages which are to be found in the Olympia/Greenleaf text.

Much that does appear in Greenleaf is, nevertheless, identical in language, and all is congruent in thought and meaning with the 1952 fraction.

the owner of the American copyright, published the English book, and then imported and sold it in this country." The court, having made this observation, proceeded to consider and upon consideration to reject the defendant's assertion that plaintiff had by such importation "made those portions of his American book which he incorporated into the English book publici juris."

The rejection by the court, however, was oblique in that it coupled its disapproval of the Tibbals view with the enunciation of an exception which produced a determination in the case under consideration contrary to what the general principle would, if the facts were present, require. The court pointed to the holding in Black v. Henry G. Allen Co., 42 F. 618, 9 L.R.A. 433 (S.D.N.Y. 1890), and indicated its accord with the grounds upon which Black bottomed its holding. Having thus declared its accord, the Bentley court spun off the distinction from the rule, a distinction which puts the present plaintiff out of court, if the facts as ultimately established upon trial are no different than those which currently appear prima facie. The Bentley court in this connection expressed the view that the Black opinion had "held that a book copyrighted in this country and published by the consent and license of the author as a part of a foreign encyclopedia, the remainder of which was the production of aliens not protected by the copyright laws of the United States, did not thereby become public property, and could not be used without the consent of the au-

thor in a reprint of the Encyclopedia." Continuing, Black denied—and Bentley approved the denial—that "the bulk of the volume [was] publici juris; aliens then not being able to secure copyright in the United States." Hence, Black concluded, the three included articles which were protected by the United States copyrights could indeed confer upon the entire volume or, a fortiori, the entire 50 volumes comprising the encyclopedia, the protection which under United States law enured to them alone. "If the author has a valid copyright," the court declared in Black as quoted in Bentley, "it is valid against any unpermitted reprint of his book; and the fact that his book is bound up in a volume with 50 other books, each of which is open to the public, is immaterial."

Thus far the Bentley principle would appear to sustain the plaintiffs in the current contention they make to this court. The fact that the Olympia edition did not claim an American copyright for its included 1952 N.A.L. fragment is irrelevant under the Bentley holding. Nor does the strength of Grove's position lose force from the circumstance that in the Bentley case it was the English copyright holder himself who had brought the work, uncopyrighted under American law, into this country, whereas in the instant situation each book marketed by Olympia bore on its back cover the admonition, though possibly with tongue in cheek,[9] that the work was "not to be sold in the U.S.A. or U.K."

The Bentley opinion stresses the fact that in the Black case wherein the court

9. The French version of the book was already available in France for the public who were literate in the language. To what readership, therefore, was the 1954 English translation, published in Paris, directed if the United States and British markets were to be foreclosed?

The 1952 N.A.L. excerpt is obscure and difficult of comprehension. For one seeking forbidden fruit its content provides no piquant flavor. There is nothing here of ribaldry even mildly titillating to anyone however ready. But Frechtman in his prefatory "Translator's Introduction" promises much. There he speaks invit-

ingly of "Genet's notoriety", "the scandalous subject matter of his books" and of his "pornography". The year 1954 was post-Victorian. It was, nevertheless, pre-Fanny Hill. The gallant lady had not yet suffered the death blow of an unwelcome judicially approved respectability. The warning against sale of the Genet masterpiece in its first complete English version in the two chief English speaking communities was possibly intended as the semantic equivalent of the then widely-sought-for literary accolade, "Banned in Boston."

had found infringement and granted injunctive relief

"* * * the Blacks inserted in the several copies of every edition of the Encyclopaedia the following notice printed on the title page.

'The following article in this volume is copyrighted in the United States of America, viz.:

'United States.

'Part I. History and Constitution. Copyright 1888 by Alexander Johnson.

'Part II. Physical Geography and Statistics. Copyright 1888 by Josiah D. Whitney.

'Part III. Political Geography and Statistics. Copyrighted 1888 by Francis A. Walker.'

And in that part of the Encyclopaedia in which the matter written by Professor Johnson appears there is inserted at the head of the article, 'Copyright 1888 by Alexander Johnson.' A similar notice is inserted at the head of the article written by Mr. Whitney and at the head of that written by President Walker. It was possible, therefore, for any one to tell on an inspection of the volume the exact copyrighted matter it contained, and there was no necessity to seek out the original American copyrighted book, and then compare it with the English publication, in order to ascertain what was and what was not copyrighted."

By way of contrast with the Black situation the Bentley opinion pointed out that

"* * * no one, on inspecting the English work, can tell what portion of it has been taken from the Telegraph Cyphers and what part has not. That he can only ascertain by securing a copy of the Telegraph Cyphers and comparing it word by word with the Code. In other words, there is nothing which indicates to the reader what portion of the work is protected by American copyright and what is not, but he is left to ascertain that fact for himself by a verbal comparison, word for word, of the American and English publications."

Following what has immediately been quoted is the excerpt from the Bentley opinion (supra fn. 3) after which the court continues with its holding in language that is clear and unmistakable:

"In our opinion one who so embodies copyrighted with uncopyrighted matter that one reading his work cannot distinguish between the two has no right to complain if the book is republished by third parties. It is true that Bentley did insert the statutory notice in the Code by which he directed attention to the fact that the Telegraph Cyphers were included in the new publication, but the statutory notice was intended by Congress to apply to publications as a whole—where the author is copyrighting the work as a whole. It was not intended by Congress that, by inserting notice in an uncopyrighted work that it contains copyrighted matter, the author could thereby prevent the republication by a stranger of the uncopyrighted book. In this case the English book covers more than 200 large pages and the original American work less than 40. One cannot ascertain what part of the English book contains the copyrighted matter taken from the American book, unless he is able to obtain from some source a copy of the original work and compare it letter by letter and word by word with the book subsequently published in England. This we do not think he is called upon to do. If one intends to assert his exclusive right to publish and sell copyrighted matter, he must so clearly indicate the matter in which he has the exclusive right that the public upon inspection can determine the question

of its own rights therein. He cannot require the public to search the markets to find a copy of his copyrighted book, then purchase it, and then compare it word by word with the uncopyrighted work."

The denial of injunctive relief in the Bentley case in an essentially parallel context requires a similar disposition of the current application. The Olympia text with its French copyright notice does not carry even the admonition of the English Bentley code, a notice nevertheless held insufficient, that an unspecified portion of the whole is covered by a United States copyright.

We need not, therefore, measure the competing specifications of irreparable damage, accrued and prospective, which may flow from the granting or withholding of an interim restraint. The plaintiffs' moving papers advance—and strongly tend to establish—that the potential for loss absent such restraint is very great. The defendants cannot be faulted for endeavoring to meet the issue thus tendered, by argument and countervailing proof. The defendants with a measure of justifiable resentment note in their papers that plaintiffs' publication was lagging behind their own until the commencement of the action with its interim restraint froze their distribution into a calamitous immobility, while plaintiffs, no longer confronting the competition that defendants might have offered, flooded and presumably have exhausted within a brief period the available market. In such merchandising context defendants maintain that the damage falls upon them alone, whereas if the stay that binds them were lifted both plaintiffs and defendants would now meet on an equal footing in their approach to the market. By such argument defendants concede that the advantage was definitely theirs in the contest for the customers before the court's direction tied their hands. The courts, however, do not recognize such equality of status or right of access to the market once the copyright owner demonstrates prima facie his proprietary right.[10] The plaintiffs have not done so here.

The motion for an injunction pendente lite is denied and the restraining order vacated.

Such findings of fact and conclusions of law as the court is required to make pursuant to Fed.R.Civ.P. 52(a) are set forth in the foregoing decision.

Settle order on notice.

---

10. Thus Judge Clark writing for the court in Houghton Mifflin Co. v. Stackpole Sons, Inc., 104 F.2d 306 (2nd Cir. 1939) cert. denied, 308 U.S. 597, 60 S.Ct. 131, 84 L.Ed. 499 said "In a case such as this, where two editions of a book of great popular interest are being actively promoted in competition with each other, it is obvious that much of the damage to a rightful owner of copyright, if any there be, will have been done by the time the action may be tried and final decree entered upon an accounting. Such owner needs protection now when the book is at the height of its sales, or else he may never be able to realize the fruits of ownership. Consequently it is settled in copyright cases that, if the plaintiff makes a prima facie showing of his right, a preliminary injunction should issue. American Code Co. v. Bensinger, 2 Cir., 282 F. 829, 835; L. C. Page & Co. v. Fox Film Corp., 2 Cir., 83 F.2d 196; Drone on Copyright, 516, 517. In our view, on such of the facts as are not in dispute, the plaintiff has so far established its right that it would be a denial of equity to allow the defendants under the circumstances to sell their book with impunity until the final outcome of the action." More recently with the same judge writing the opinion in Rushton v. Vitale, 218 F.2d 434 (2nd Cir. 1955), the Court of Appeals declared, citing the Houghton Mifflin case, "when a prima facie case for copyright infringement has been made, plaintiffs are entitled to a preliminary injunction without a detailed showing of danger of irreparable harm." To like effect are Joshua Meier Co. v. Albany Novelty Mfg. Co., 236 F.2d 144 (2nd Cir. 1956); Beechwood Music Corp. v. Vee Jay Records, Inc., 226 F.Supp. 8 (S.D.N.Y.1964) affirmed without considering point for which we cite the District Court determination, 328 F.2d 728; King v. Mr. Maestro, Inc., 224 F.Supp. 101 (S.D.N.Y.1963); Royalty Designs, Inc. v. Thrifticheck Service Co., 204 F.Supp. 702 (S.D.N.Y.1962).