**GROVE PRESS, INC., Editions Gallimard Et Cie, Jean Genet and Bernard Frechtman, Plaintiffs,**

v.

**The GREENLEAF PUBLISHING COMPANY, Reed Enterprises, Inc., New-Cal Publications, Inc., G. I. Distributors, Inc., William L. Hamling and Frances Hamling, Defendants.**

**No. 65–C–677.**

United States District Court
E. D. New York.

Oct. 4, 1965.

On Petition for Reconsideration and/or Rehearing Nov. 17, 1965.

---

Rembar & Zolotar, Richard T. Gallen, New York City, for plaintiffs; Charles Rembar, New York City, of counsel.

Greer Marechal, Jr., New York City, for defendants.

BARTELS, District Judge.

This is an action against the defendants based upon an alleged copyright infringement of the copyright on a book by Jean Genet, a well known author, published by Editions Gallimard Et Cie in Paris in the French language, entitled "Journal du Voleur" ("The Thief's Journal"), and also a copyright upon an excerpt therefrom published in an anthology in the English language in the United States. The plaintiffs include the author and owner of the copyright and those claiming license and contractual rights with respect thereto, and the defendants include the publisher, its officers, and also the printers and distributors of the accused publication. Both parties move for a partial summary judgment pursuant to Rule 56, Fed.Rules Civ.Proc., 28 U.S.C.A., seeking a determination as to the merits of the infringement questions based upon the undisputed facts, leaving by agreement the other issues, if any, such as proof of damages, profits, attorneys' fees, etc., for future consideration. Jurisdiction is founded on 28 U.S.C.A. § 1338(a) and §§ 101 and 112 of the Copyright Act (hereinafter referred to as "the Act"), 17 U.S.C.A. §§ 101 and 112.

*Pertinent Facts*

The controversy revolves around five books:

1. The genesis of "The Thief's Journal" begins on June 16, 1949 with its publication in France and in French under the title "Journal du Voleur". This edition (hereinafter sometimes referred to as "the underlying work") contained a legend following the title page reading:

"Tous droits de traduction, de reproduction et d'adaptation réservés pour tous les pays, y compris l'U.R.S.S.

(C) 1949 Editions Gallimard." [1]

Defendants concede the validity of the 1949 copyright. On July 7, 1965, as a prerequisite to this suit, the plaintiffs registered this copyright in the United States under Section 13 of the Act, 17 U.S.C.A. § 13.

2. On October 21, 1952, an English translation of a portion of "The Thief's Journal", which Genet and Gallimard had licensed plaintiff Bernard Frechtman to make, was published in the United States by The New American Library of World Literature, Inc. in an anthology entitled "New World Writing Second Mentor Selection". This excerpt, which consisted of five pages (hereinafter sometimes referred to as the "N.A.L. copyright") contained the following legend on the back of the title page:

"A section from The Thief's Journal Copyright, 1952, by Bernard Frechtman"

Registration of this copyright was made in the United States on November 12, 1952. Defendants admit the validity of the 1952 copyright.

3. In 1954 an English translation (hereinafter sometimes referred to as "the Olympia edition") by Frechtman of the complete "Journal du Voleur" was published in France by The Olympia Press under license from Genet. The following legends appear in the proper places on the Olympia edition:

"Published in agreement with the Librairie Gallimard.

Journal du Voleur was first published in 1949 in a privately printed edition of four hundred copies. A slightly modified version was published in the same year by the Librairie Gallimard. The present translation follows the original and only complete text, though it incorporates a few footnotes which the author added to the later edition.

Copyright 1954 by B. Frechtman and The Olympia Press, Paris"

and on the back cover page the following appears:

"NOT TO BE SOLD IN THE U.S.A. OR U.K."

No application for United States registration of copyright and no attempt to secure *ad interim* protection pursuant to 17 U.S.C.A. §§ 22 and 23 were made for the Olympia edition.

4. On November 16, 1964, plaintiff Grove Press, Inc., acting pursuant to an exclusive license granted by Genet on October 19, 1959, published for distribution in the United States and Canada another English translation (hereinafter referred to as "the Grove edition") made by Frechtman. All copies of the Grove edition contained the following legends on the back of the title page:

"Copyright (C) 1964 by Grove Press, Inc.

All Rights Reserved

Originally published by Librairie Gallimard in Paris, France under

---

1. Section 10 of the Act, 17 U.S.C.A. § 10, provides:
   "Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title; and such notice shall be affixed to each copy thereof published or offered for sale in the United States by authority of the copyright proprietor, except in the case of books seeking ad interim protection under section 22 of this title."

the title Journal du Voleur, copyright (C) 1949 by Librairie Gallimard."

Registration of this copyright in the United States was made on January 26, 1965. Defendants do not contest the validity of this copyright and plaintiffs assert no claim of infringement as to this publication except insofar as Grove Press sues as a licensee of Jean Genet.

5. In 1965 defendants published, distributed and sold in the United States an English translation of "Journal du Voleur" which had been produced by photocopying the Olympia edition. Upon this work (hereinafter referred to as "the Greenleaf edition") the following legends appear:

> "This edition follows the original text of the Olympia Press edition, published in Paris; it is complete and unabridged." (on the back of the first page)

> "translated from the French by BERNARD FRECHTMAN" (on the title page)

> "special contents this edition copyright, (C), 1965 by

> The Greenleaf Publishing Company" (on the back of the title page)

None of the plaintiffs has authorized the publication of the Greenleaf edition. Defendants rest their authority to copy upon the theory that the Olympia edition, including the N.A.L. excerpt, was in the public domain.

■ Notwithstanding the extensive and detailed contentions and arguments of both sides, the issues may be reduced to the fundamental question of whether Greenleaf infringed either the N.A.L. copyright or the 1949 copyright, or both. To the extent that this involves an adjudication of the effect upon the underlying work of an English translation first published in a foreign country without copyright registration in the United States and without seeking *ad interim* protection, it appears to be an issue of first impression. At all events, no authorities have been cited or found squarely in point.[2]

### The N.A.L. Copyright

[2] The first question posed involves the alleged infringement of the N.A.L. copyright. The issue raised is whether this copyright lost its vitality by its incorporation in the Olympia and Grove work[3]. Each party argues that Bentley v. Tibbals, 2 Cir. 1915, 223 F. 247, is decisive in its favor. In Bentley a British citizen secured in 1906 a copyright in the United States of a book entitled "Bentley's Telegraph Cyphers", the now famous international telegraphic code. In 1907 he published in London a larger book entitled "Bentley's Complete Phrase Code" containing a substantial amount of the "Cyphers" together with additional matter. For that work he secured a British copyright, on the title page of which appeared the following statement:

> "This Code includes the Telegraph Cyphers entered according to act of Congress in the year 1906, by E. I. Bentley in the office of the Librarian of Congress at Washington, D. C. All rights reserved. Entered at Stationer's Hall." (p. 250)

---

2. As a result of United States ratification of the Universal Copyright Convention in 1955, foreign authors of works first published abroad in the English language may secure copyright protection without complying with the manufacturing and *ad interim* provisions. See 17 U.S.C.A. § 9(c) (1964 Supp.) However, it is unnecessary to consider what bearing this might have had on the outcome of the present case since the Universal Copyright Convention "has no retroactive effect on works already in the public

domain in any contracting states * * *." 1954 U.S.Code Cong. and Adm.News, p. 3630.

3. The 5-page 1952 N.A.L. excerpt is substantially reproduced in the complete 1954 Olympia translation. The existence of approximately 136 minor differences in phrasing between the two segments and the interruption of the excerpt by the insertion of two new pages does not alter this conclusion.

Bentley then sold, both in the United Kingdom and in the United States, copies of this larger book which was uncopyrighted. Tibbals copied the exact "Complete Phrase Code" in the same size and color, and sold this book under the title "Bentley's Complete Phrase Code". This publication Bentley claimed infringed his 1906 copyright of "Bentley's Telegraph Cyphers", the essential features of which were embodied in the larger work. Tibbals contended that Bentley by importing and selling the larger work in the United States, lost his right of protection to anything contained therein and "that the publication of parts of a copyrighted book as parts of an uncopyrighted book involves an abandonment of the copyright." The Court denied the injunction, grounding its decision upon the fact that there was nothing in the larger work which would identify "the copyrighted from the uncopyrighted matter", stating:

"In our opinion one who so embodies copyrighted with uncopyrighted matter that one reading his work cannot distinguish between the two has no right to complain if the book is republished by third parties." (p. 256)

It is true that the Court in the course of its opinion, called attention to the fact that the larger book was imported by the copyright owner and implicitly referred to this difference in citing United Dictionary Company v. G. & C. Merriam Company, 1908, 208 U.S. 260, 28 S.Ct. 290, 52 L.Ed. 478. Plaintiffs rely upon this distinction in support of their position that the Bentley ruling is not applicable to the facts in this case. The premise of the Bentley decision, however, was not the nature of the importation but the failure of identification.[4]

Here, unlike Bentley's publication, neither the Olympia nor the Grove publication contained any notice that the copyrighted N.A.L. excerpt was included anywhere in the respective publications. But even if such notice had been imprinted on the title page of either edition, no one by an inspection of either work could have identified which portion was the N.A.L. excerpt and which was not. The fragment was completely submerged and unidentified in both versions. Thus, if there was any copying of the N.A.L. excerpt from the Olympia and the Grove editions, it did not constitute a copyright infringement. In essence, the same conclusion was reached by this Court in denying the plaintiffs' application for a preliminary injunction.[5]

### The 1949 Copyright
### (the underlying work)

A more serious and subtle issue is raised by the alleged infringement of the 1949 copyright on the original French language work involving the nature of a translation and the effect of its dedication.

■ Jean Genet's original story published in the French language, was copyrighted in 1949 and there is no question that that copyright still subsists. Frechtman's English translation published in France in 1954, followed the original and only complete text of the 1949 publication. While it bore the inscription "Copyright 1954 by B. Frechtman and The Olympia Press, Paris", it concededly did not comply with the *ad interim* protection provided by Sections 22 and 23 of the Act, 17 U.S.C.A. §§ 22 and 23, and for the purpose of this decision, it will be assumed *arguendo* that it fell within the public domain.[6]

---

4. In United Dictionary Company v. G. & C. Merriam Company, supra, Mr. Justice Holmes stated: "But it is hard to see how the right to copy a book, whether lawfully or unlawfully imported, can be affected by the mode in which it got here." (28 S.Ct. p. 291)

5. Judge Rosling's opinion of July 21, 1965, 247 F.Supp. 127, which was limited to the

issue of infringement of the N.A.L. copyright.

6. Based upon their interpretation of Sections 10, 22, and 23 of the Act, 17 U.S.C.A. §§ 10, 22, and 23, plaintiffs contend that the Olympia translation was not in the public domain. Since the Court has reached its conclusion predicated on the assumption that the Olympia

The Greenleaf edition "follows the original text of the Olympia Press edition, published in Paris" as it was "translated from the French by BERNARD FRECHTMAN". The query is, what did Greenleaf copy when it copied this English translation. Defendants assert that physically all they copied was an uncopyrighted English translation and nothing more, that they did not copy the copyrighted book which was a 1949 French language work, and that when Frechtman failed to obtain copyright protection for his English translation in France of the 1949 French language work, that translation which was with the consent of the author, of necessity included Genet's novel and the novel as thus translated was automatically dedicated to the public. They argue, therefore, that the accused book could not have infringed the 1949 copyright.

*Discussion*

■ Resolution of the problem involves the interpretation of the basic concept of copyright protection upon which reasonable men in this case might differ. The essential purpose of the copyright law is to grant valuable and enforceable rights to composers, authors, publishers, and others without imposing burdensome requirements, Mazer v. Stein, 1954, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630, rehearing denied, 1954, 347 U.S. 949, 74 S.Ct. 637, 98 L.Ed. 1096, and at the same time to require a notice of the copyright to be affixed to each copy of the work, to protect the innocent from the penalties of infringement. H. M. Kolbe Co. v. Armgus Textile Company, 2 Cir. 1963, 315 F.2d 70, 99 A.L.R. 2d 390. The Court is thus confronted with the question of whether Frechtman's English translation published abroad without *ad interim* protection destroyed the author's copyright protection in his literary composition.

Section 7 of the Act, 17 U.S.C.A. § 7, reads as follows:

"Compilations or abridgments, adaptations, arrangements, dramatizations, *translations*, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter, shall be regarded as *new works subject to copyright* under the provisions of this title; *but the publication of any such new works shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof*, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works." (Emphasis supplied)

■ The above section permits the copyright of a translation of a work in the public domain or of a copyrighted work with the consent of the owner without permitting the publication of such "new work" to affect the validity of the existing copyright upon the matter employed in such translation. If the work translated is in the public domain, of course no consent of the copyright owner is required. The pertinence of the section is only to demonstrate the fact that a translation can be copyrighted separate and apart from a copyrighted work without affecting the subsisting copyright. The copyright of the translation is not mandatory under the section to preserve the copyright on the underlying work.

■■ Keeping in mind the purpose of the Act, the Court is compelled to reject the defendants' interpretation of the effect of Greenleaf's copying Frechtman's translation as too literal, mechanical and unrealistic. It is obvious that Greenleaf copied not only the words of

---

translation was so dedicated, it is unnecessary to reach the merits of this contention. In addition, no affirmative relief could be grounded on the Olympia translation, at least in this Court, since

no certificate of registration on this work has been issued by the Register of Copyrights. Vacheron & Constantin-Le Coultre W. v. Benrus W. Co., 2 Cir. 1958, 260 F.2d 637.

Frechtman, the translator, but also the content and meaning of those words as created in Jean Genet's original biographical story. This creation included the entire plot, scenes, characters and dialogue of the novel, i. e., the format and pattern. Greenleaf copied two things, (1) the words and (2) the story. Frechtman's reproduction of the novel in another language was permitted by the author but this did not constitute a consent that reproduction by others could be accomplished without Genet's authority if Frechtman failed to copyright his derivative work. The fact that it was unnecessary for Greenleaf to obtain Frechtman's consent did not automatically make it unnecessary for Greenleaf to obtain the consent of the copyright owner. It is an old story that reproductions of a copyrighted article cannot be made without the consent of the creator. Illustrative of this principle is Mr. Justice Holmes' decision holding that an attempt to reproduce the copyrighted story of "Ben Hur" by moving pictures of scenes dramatizing the work, constituted an infringement of the author's copyright, wherein he remarked:

> "But if a pantomime of Ben Hur would be a dramatizing of Ben Hur, it would be none the less so that it was exhibited to the audience by reflection from a glass, and not by direct vision of the figures,—as sometimes has been done in order to produce ghostly or inexplicable effects. *The essence of the matter in the case last supposed is not the mechanism employed, but that we see the event or story lived.*" Kalem Company v. Harper Brothers, 1911, 222 U.S. 55, 61, 32 S.Ct. 20, 21, 56 L.Ed. 92. (Emphasis supplied)

The query is, what does a copyright of a novel include? Does it cover only the form of communication or the mechanism employed, or does it also embrace the pattern of the story? The essence of a novel or any other story for that matter, is the plot, plan, arrangement, characters and dialogue therein

contained and not simply its form of articulation. "In truth, every author of a book has a copyright in the plan, arrangement and combination of his materials, and in his mode of illustrating his subject, if it be new and original in its substance." Emerson v. Davies, D.Mass. Cir. 1845, 8 Fed.Cas. 615, 619 (Case No. 4,436). While this does not mean that the abstract idea of the novel or play alone is protected, it does mean that the particular pattern employed in arranging and expressing that idea is entitled to protection. Eisenschiml v. Fawcett Publications, 7 Cir. 1957, 246 F.2d 598, 603, cert. denied, 1957, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262; Holdredge v. Knight Publishing Corp., D.C.Cal.1963, 214 F.Supp. 921, 923; Chafee, Reflections on the Law of Copyright: I, 45 Col. L.Rev. 503, 513 (1945). It may be difficult sometimes to distinguish whether the idea or plot alone is being employed or whether the pattern is being copied, but the line must be drawn. Cf., Nichols v. Universal Pictures Corporation, 2 Cir. 1930, 45 F.2d 119, cert. denied, 1931, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795. In the opinion of Professor Nimmer: " * * * it would seem that any authorized publication of a derivative work must necessarily also constitute a publication of the basic work upon which it is based." Nimmer on Copyright (1965) § 57.1, p. 220. The translation does not insulate the original story from copyright infringement even though the translation itself may be uncopyrighted. Like any other derivative work, the translation is separate and apart from the underlying work and a dedication to the public of the derivative work did not without more, emancipate the pattern of the underlying work from its copyright. The essence of the matter, as Mr. Justice Holmes observed, is that "we see the event or story lived" and that story is copyrighted. Kalem Company v. Harper Brothers, supra.

Each party relies heavily upon the case of G. Ricordi & Co. v. Paramount Pictures, Inc., 2 Cir. 1951, 189 F.2d 469, cert. denied, 1951, 342 U.S. 849, 72 S.Ct.

77, 96 L.Ed. 641. It is appropriate therefore to examine its facts. The work involved there was "Madame Butterfly", the original novel having been written in 1897 by John Luther Long and copyrighted. Thereafter Long licensed David Belasco to write a play based upon the novel under the same name, which was not copyrighted until 1917. In 1901 Long and Belasco granted Ricordi rights to make a Libretto for an opera of Belasco's play "founded on the original theme", written by Long; "the said Libretto and all rights therein, dramatic or otherwise, to be the exclusive property of" Ricordi. Under this grant Puccini composed the opera upon which Ricordi secured both the original and renewal copyright. In 1925 Long obtained a renewal of the copyright on his novel and in 1932 Long's administrator granted Paramount the motion picture rights therein. No renewal was ever obtained of the copyright on Belasco's play. Ricordi claimed to be the exclusive owner of the motion picture rights in the novel, based upon the original agreement with Long and Belasco and his renewal copyright of the opera.

The Court of Appeals in reversing judgment in favor of Ricordi, held that the play was in the public domain and both parties were free to make a motion picture version thereof; that Paramount had the exclusive motion picture rights in the novel and therefore plaintiff could not make general use thereof for a motion picture version of its opera, and that plaintiff had the exclusive motion picture rights in the opera and Paramount could make no use of the opera in a motion picture version of the novel.

Upon a petition for clarification as to the meaning of the Court's statement that "When the copyright expired, the play was property in the public demesne * * *" (p. 471), the Court clarified its holding in these words:

"What the petitioner desires is an express statement that only the new matter which Belasco's play added to Long's novel came into the public demesne upon the expiration of Belasco's copyright. It is implicit in the opinion as a whole that what is dedicated to the public as a condition of obtaining a copyright is only such matter as is copyrightable, but to avoid any possible cavil we will amend the above quoted sentence to read as follows: 'When the copyright expired, the copyrightable new matter in the play was property in the public demesne, since the record discloses no renewal of the copyright'". (p. 472)

While that case involved a renewal of copyright, the differentiation between dedicating the underlying work and the derivative work to the public is the same in both cases.

Defendants claim that Ricordi simply means that the stage play was in the public domain and the screen play was not because it was a new version of the original novel; and similarly in this case, that while the Frechtman translation was in the public domain, no other translation of the 1949 French work could be made without Genet's permission. They argue from this comparison that they had a right to copy the Frechtman translation in the same manner as anyone could copy Belasco's stage play. This is a false and distorted view because it ignores the fact that the only thing placed in the public domain in the Ricordi case was the *new matter* in the play upon which the original copyright had expired. The Court held that the "Madame Butterfly" novel could not be employed for any purpose without the consent of the proprietor or the licensee of the copyright, and that only the new matter that Belasco had added to Long's novel was dedicated. By parallel reasoning, the only *new matter* that Frechtman added to the Genet novel was his translation and only that could have been dedicated to the public. As a practical matter, new matter which a play adds to a novel might be more discernible or separable than new matter which a translation adds to a story. Both, however, represent a change in the mechanism or medium of expressing the same underlying work, and both

are derivatives which may be described as new works under Section 7 of the Act. If the derivative, such as the new matter in a play or the new matter added by different mediums of thought conveyance [7] or communication represented by translation, cannot be used without copying part or all of the copyrighted underlying work, then the consent of the proprietor of that copyright must be obtained.

■■■■ Defendants, however, have not been charged with violating the copyright law by an unauthorized translation of the underlying work. What the defendants did was to copy a translation which they allege was not copyrighted. The fact that the copying of the original story was accomplished indirectly through copying of a translation of the original was nonetheless copying. Unauthorized copying may be effected either directly or indirectly; thus copying from a copy is no less an infringement than copying from the original copyrighted work.[8] In Wihtol v. Crow, 8 Cir. 1962, 309 F.2d 777, the plaintiff had composed a song which he had first copyrighted in 1935 and later incorporated in a new version which he also copyrighted in 1944. The defendant unauthorizedly incorporated the 1944 version of the song (which included the 1935 copyright) in a new arrangement of his own. While he copied only one song, it was held that he had infringed both of plaintiff's copyrights. By analogy, an infringement of an underlying copyright may likewise occur by copying an uncopyrighted translation of a copyrighted original since the underlying copyright might not be disclosed in either case.

■■■■ A postscript should be added. Defendants have placed considerable emphasis upon the fact that the Olympia edition did not obtain *ad interim* protection. While this is true and by hypothesis placed this edition in the public domain, it does not follow that such failure by the publisher or translator should be fatal to the copyright on the pattern of the underlying work unless the author has consented to such dedication. Here it is admitted that Librairie Gallimard and The Olympia Press executed a contract under which Gallimard granted Olympia the right to publish the translation of "The Thief's Journal" in all countries "provided he sells it neither in England nor in the United States (the above edition to carry the notation 'Not to be sold in the USA and the United Kingdom')". Accordingly, a legend was placed on the back cover page on all copies of the Olympia edition reading: "NOT TO BE SOLD IN U.S.A. OR U.K.". There was, in addition, a prominent copyright notice placed upon the Olympia edition which notified the world that it followed the original and only complete text of the publication in 1949 by Librairie Gallimard.

While this legend and notice might not have been sufficient to protect the translation, it was ample notice that the Olympia edition was only a translation which was not to be sold in the United States and that accordingly there might be a copyright on the underlying work.[9] At all events, the above contract and the legends placed upon the Olympia edition were sufficient to establish that there was no consent on the part of the author to dedicate his underlying work to the

---

7. While an idea is not entitled to copyright protection, Holmes v. Hurst, 1899, 174 U.S. 82, 19 S.Ct. 606, 43 L.Ed. 904; Kalem Company v. Harper Brothers, supra, the proprietor of a copyright in a literary composition has the exclusive right to exploit his form of expression. It is difficult to classify a translation as a new and original expression of an uncopyrighted idea. It appears to be no more than a transfer of the original expression of the idea or story to another language.

8. Cf., Davis v. DuPont de Nemours & Company, S.D.N.Y.1965, 240 F.Supp. 612; see also Nimmer on Copyright (1965), § 42, p. 174.

9. Counsel for defendants admit that the defendants published only after counsel made inquiry and rendered their opinion that no infringement would ensue.

public. It cannot therefore be claimed that he abandoned his copyright on the 1949 French edition. To impose upon the author the duty to see that the Olympia edition obtained *ad interim* protection in the United States in order that his own copyright on the pattern of the underlying work might survive, would appear to be imposing upon the author an unnecessarily burdensome requirement. As far as the public is concerned, it was placed upon sufficient notice to inquire as to any copyright on the underlying work. In the reverse situation a notice of copyright on the derivative work has been held sufficient to protect both the derivative as well as the underlying work. In Nom Music, Inc. v. Kaslin, 2 Cir. 1965, 343 F.2d 198, the Court remarked:

> "In part because of the statutory equation of a derivative work with a 'new work,' it has been held that the notice need give only the date and owner of the copyright in the derivative work, *leaving the reader to his own devices in ferreting out this information as to the original.*" (p. 200) (Emphasis supplied)

See National Comics Publications v. Fawcett Publications, 2 Cir. 1951, 191 F.2d 594; Wrench v. Universal Pictures Co., S.D.N.Y.1952, 104 F.Supp. 374. Consequently, it is clear enough that as far as affixing a copyright notice is concerned, the copyright on the underlying work is not dependent upon the copyright on the derivative or new work.

■ The conclusion, therefore, is that the defendants' publication and sale within the United States of Frechtman's English translation of "Journal du Voleur" accomplished by photocopying the Olympia edition, constitutes an infringement of Jean Genet's 1949 copyright published by Gallimard and registered under Section 13 of the Act. Since the determination of the quantum of damage as well as the parties entitled thereto and the parties liable therefor, have by agreement been deferred for a subsequent hearing, summary judgment will be entered for such of the plaintiffs as shall be subsequently determined to have an interest as either copyright owner or licensee of the 1949 copyright, against the defendant Greenleaf and such of the other defendants as may be subsequently determined to have participated in infringing said copyright and for the amount of damages to be subsequently determined. Settle order on two (2) days' notice.

### On Petition for Reconsideration and/or Rehearing

On October 4, 1965, this Court granted the plaintiffs' motion for a partial summary judgment leaving, pursuant to the agreement of the parties, certain other issues for future determination. Subsequently, the defendants, after the expiration of the time permitted for reargument under Rule 9(m) of the General Rules of this Court, petitioned this Court for "reconsideration and/or rehearing regarding a certain specific question as enunciated in the decision filed October 5 on Plaintiffs' Motion for Summary Judgment herein".

■ Aside from the fact that the application was untimely the defendants have failed to set forth any matters or controlling decisions which the Court in its opinion has overlooked, but have simply reiterated in another form arguments previously submitted in their written briefs and oral arguments. One of the old arguments which the defendants attempt to repeat in a new form, is a suggestion that if a derivative work were fully copyrighted, only the permission of the derivative author would be necessary to make a copy of the derivative work because that right was already granted by the author of the underlying work. Such a statement may or may not be true, depending upon the facts of the particular case. If the derivative work cannot be copied without automatically copying the pattern of the underlying work, then the authority to grant third parties the right to make a copy of the copyrighted underlying work or its pattern is not included in the mere

authority given to a derivative author to create the new work. Cf., Nom Music, Inc. v. Kaslin, 2 Cir. 1965, 343 F.2d 198; see also Ilyin v. Avon Publications, Inc., S.D.N.Y.1956, 144 F.Supp. 368; Mills Music, Inc. v. Cromwell Music, Inc., S.D. N.Y.1954, 126 F.Supp. 54.

Even if the predicate upon which the defendants base their argument was valid, it would not follow that the failure of the derivative author to copyright his derivative work would automatically dedicate the pattern of the copyrighted underlying work to the public domain.

Defendants' application is not only untimely but without merit and is accordingly denied. Settle order on two (2) days' notice.