FILMVIDEO RELEASING CORPORATION, Plaintiff,

v.

David R. HASTINGS, II, as Administrator with Will Annexed of the Estate of Clarence E. Mulford, Defendant,

David R. Hastings, II, and Peter G. Hastings, as Trustees of the Inter Vivos Trust and of the Testamentary Trust Created by Clarence E. Mulford, Intervenors.

No. 75 Civ. 2248 (HFW).

United States District Court, S. D. New York.

Oct. 20, 1976.

---

Howard Gotbetter, New York City, for plaintiff.

Burns & Jacoby, New York City, by Herbert P. Jacoby, New York City, of counsel, for defendants.

## OPINION

WERKER, District Judge.

This case comes before the court on plaintiff's motion pursuant to Rule 12(b)(6), Fed. R.Civ.P., for dismissal of the counterclaim for failure to state a claim upon which relief can be granted and, alternatively, for summary judgment on the counterclaim pursuant to Rule 56, Fed.R.Civ.P. I have considered the sufficiency of the counterclaim in this opinion, however, pursuant to Rule 12(b), Fed.R.Civ.P., I have treated the motion as one for summary judgment on the counterclaim since the parties have presented matters which go well beyond the pleadings.

Between 1907 and 1935, Clarence E. Mulford wrote and copyrighted seventeen "Hopalong Cassidy" books. A renewal copyright in each of the books was obtained either by Mulford or, after his death in May of 1956, by his executor. Those renewal copyrights are still effective today.[1] Seventeen Hopalong Cassidy motion pictures copyrighted by Paramount Pictures were also produced under agreements between Mulford and Prudential Studios Corporation and Mulford and Este Productions, Inc.[2] Although the parties dispute the ex-

---

1. The renewal term of copyrights subsisting prior to December 31, 1974 has been continued until December 31, 1976 by Pub.L. No. 93–573, 88 Stat. 1873 (1974).

2. On March 25, 1935, Mulford entered into an option agreement with Prudential Studios Corporation that granted Prudential the right to:

   "produce, transmit, reproduce, distribute, exhibit and exploit in any any manner or by any method or device (except as hereinafter

specified) . . . motion pictures taken from or based upon the [seventeen] books." The agreement also provided that:

   "All television, broadcasting and radio rights are specifically reserved to Mr. Mulford." Two years later, after Prudential had exercised its option with respect to twelve of the novels, Este Productions, Inc., which was apparently a successor to Prudential, entered into an agreement with Mulford to write nine screen plays using the Hopalong Cassidy character. The grant of rights to Este was identical to that

tent to which the films rely upon the books or the characters in them, they agree that the copyrights in the motion pictures were not renewed and that they expired during the 1960s.

In 1973, after the Paramount copyrights had expired, plaintiff purchased physical negatives of the motion pictures. Its grantor had acquired them under a contract that restricted the interest in the films to foreign exhibition, distribution and exploitation. The purchase agreement covering the sale to the plaintiff contains similar restrictions. It also recites that the plaintiff has seen several earlier agreements governing the use of the motion pictures.

The complaint in this action seeks a declaratory judgment that the renewal copyrights in the books are invalid and that the books are therefore in the public domain. In the alternative, plaintiff seeks a declaratory judgment that the motion pictures are now in the public domain and that they are available for the plaintiff's use without restriction. In particular, the plaintiff seeks to use the films on television. The defendants and intervenors (hereinafter "defendants") have counterclaimed for an injunction restraining the plaintiff from using the motion pictures and for damages for copyright infringement. The court has jurisdiction of this suit under the Copyright Act, 17 U.S.C. § 1, *et seq.*

■ The issue is whether the defendants' renewal copyrights *in the novels* may be infringed by the showing on television of motion pictures now in the public domain which were made under an agreement with the author. Three cases considered at length by both sides are dispositive of this question. *G. Ricordi & Co. v. Paramount Pictures,* 189 F.2d 469 (2d Cir.), *cert. denied,* 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951); *Rohauer v. Killiam Shows, Inc.,* 379 F.Supp. 723 (S.D.N.Y.1974); and *Grove Press v. Greenleaf Publishing Co.,* 247 F.Supp. 518 (E.D.N.Y.1965) (Bartels, J.).

*Ricordi, supra,* involved the novel "Madame Butterfly," written by David Long and copyrighted by a third party in 1897. In 1901, David Belasco wrote a play entitled Madame Butterfly with the consent of Long and the copyright holder. Thereafter, Ricordi was licensed by Long and Belasco to prepare a libretto for the operatic version of Madame Butterfly. In 1904, it obtained an original copyright, and it later acquired a renewal copyright in the renowned Pucinni opera; Belasco's play was not copyrighted until after the opera became protected. Long renewed his copyright in the novel in 1925 and following his death Long's administrator granted the defendant the motion picture rights under the novel's renewal term. The defendant also acquired the motion picture rights in the Belasco play. Thereafter, the Belasco copyright expired without have been renewed.

Ricordi sought to make a motion picture version of the opera. Ricordi held the renewal copyright in the opera and the play was in the public domain, but the defendant argued that the motion picture would infringe its renewal copyright interest in the novel. The court held that "the plaintiff [was] restricted to using what was copyrightable as new matter in its operatic version of the novel." 189 F.2d at 472. When asked to clarify the effect of its decision on the use of the play, the court observed:

"When the copyright expired, the copyrightable *new matter* in the play was property in the public demesne, since the record discloses no renewal of the copyright." 189 F.2d at 472. (Emphasis added.)

---

contained in the earlier agreement except the motion pictures were to be based upon the screenplays rather than the novels. Este agreed to assign all rights derived from the literary property in each motion picture to Mulford immediately after it copyrighted the motion picture, including:

"all rights of production and use upon the spoken stage, with living actors appearing

and speaking in person . . . and all television, broadcasting and radio rights . . . ."

Mulford was also given the right to copyright the manuscript of each completed screenplay. The record does not reveal whether the remaining five films were produced under the earlier or the later agreement.

Plaintiff contends that *Ricordi* should be distinguished from the instant action because it dealt with the uses of "one-dimensional" literary materials rather than "three-dimensional" films resulting from the collaborative effort of numerous individuals. Although I find this distinction novel, I do not find it persuasive. Numerous decisions demonstrate that material copyrighted in one medium may be infringed by material produced in another medium. *See, e. g., Reyher v. Children's Television Workshop,* 377 F.Supp. 411 (S.D.N.Y. 1974).

The court is also unable to agree with plaintiff's contention that the "three-dimensional" motion pictures necessarily constituted new matter and not derivative works.[3] Plaintiff maintains that section 5 of the Copyright Act, 17 U.S.C. § 5; Copyright Office Form L–M, the application form for motion pictures; and critical reviews of the Hopalong Cassidy films that appeared in The Film Daily between October 12, 1986 and February 15, 1939 demonstrate that the motion pictures could not possibly infringe upon the renewal copyrights in the novels. Reliance upon all three sources is misplaced.

Section 5 of the Copyright Act lists fourteen classes of work which may be copyrighted. The plaintiff apparently believes that works in one class cannot infringe upon copyrights in another. However, section 5 states that the list is not exclusive and that errors in classification shall not impair copyright protection. There is no indication whatsoever that works copyrighted under one subject matter class cannot infringe copyrights secured under another. In fact, Form L–M may be used to register two distinct subject matter classes contained within section 5 of the Act. Of the reviews submitted by the plaintiff, 16 credit Mulford as the author of the film. This hardly suggests that the films could not infringe the novels. Frankly, I am unable to understand why the plaintiff submitted these exhibits for my review since they clearly do not support its view that the motion pictures must be entirely new matter.

*Rohauer, supra,* the second of the three cases, concerned a dispute over the television rights to "The Son of the Sheik." This motion picture starring Rudolf Valentino was produced by an assignee of the motion picture rights in the copyrighted novel written by Edith Hull. The motion picture was separately copyrighted and at the time of the alleged infringement Killiam Shows owned the renewal copyright interest. The copyright in the novel had been renewed after Edith Hull's death by her daughter Cecil who had assigned all her motion picture and television rights to Rohauer. Suit was brought by Rohauer and Cecil Hull after a copy of the motion picture made available by Killiam Shows was exhibited, on three separate occasions, by WNET, an

---

**3.** Section 7 of the Copyright Act, 17 U.S.C. § 7, states that:

Compilations or abridgments, adaptions, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter, shall be regarded as new works, or works republished with new matter, shall be regarded as new works subject to copyright under the provisions of this title; but the publication of any such new works shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works.

Nimmer points out that the use of the term "new work" in this section is misleading. He suggests that "derivative work" is a more accurate description of the subject matter protected by section 7:

". . . a work will be considered a derivative work only if it would be considered an infringing work if the material which it has derived from a prior work had been taken without the consent of a copyright proprietor of such prior work. It is saved from being an infringing work only because the borrowed or copied material was taken with the consent of the copyright owner of the prior work, or because the *prior work* has entered the public domain." (emphasis added) (footnote omitted) 1 Nimmer on Copyright § 39.

educational television station in the New York City area.

The court held that the showings on television infringed the renewal copyright in the book held by Rohauer and Cecil Hull, despite Edith Hull's earlier assignment of the motion picture rights for the renewal term to a predecessor in interest of Killiam Shows. In doing so, it found

"highly persuasive the views of the leading text writer in this field: 'If the author or other assignor of the renewal expectancy is not living when the renewal rights vest, then those persons who by statute succeed to the renewal rights are not bound by any assignment executed by the author (or by any assigning member of a prior renewal class) so that the assignee takes nothing.' Nimmer on Copyrights § 117.3." 379 F.Supp. at 727.

There is no reason to differentiate between the renewal rights of the child in *Rohauer* and those of the executor of Mulford here. *Miller Music Corp. v. Daniels, Inc.,* 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed.2d 804 (1959). When Mulford died without a widow or child surviving him, the right to renew the copyright devolved upon his executor by the express terms of the Copyright Act[4] and the counterclaim states a cause of action at least with respect as to those copyrights renewed by the executor. Indeed, in anticipating the defendant's argument in opposition to the motion before the court in his memorandum of law, the plaintiff appears to concede the correctness of this position.

The plaintiff nevertheless seeks to distinguish *Rohauer* because the motion pictures to be televised here are no longer subject to copyright protection. The counterclaim is not for infringement of the motion picture copyrights, however; it is for infringement of the renewal copyrights in the books written by Mulford. These copyrights can be infringed by the use of materials in the public domain as readily as they are by the use of separately copyrighted matter.[5] *Grove Press,* the third case to be considered, demonstrates this.

*Grove Press* involved Jean Genet's book "Journal du Voleur" (A Thief's Journal), published in France on June 16, 1949 by Editions Gallimard and properly copyrighted in the United States. In 1954, Genet licensed the Olympia Press to publish an English translation of the book for distribution outside of the United States and Canada. However, no attempt was made to secure United States copyright protection for the Olympia translation. Ten years later, Grove Press published a version of the Olympia Press translation under an exclusive license granted by Genet. In 1965, the defendants published a third English version of Genet's book made by photocopying virtually all of the Olympia Press edition.

Grove Press brought suit for infringement of the 1949 copyright in the French language edition published by Gallimard. The defendants contended that they had only used matter that had been dedicated to the public. This is precisely the theory presented by the plaintiff here. Judge Bartels assumed *arguendo* that the Olympia Press edition copied by the defendants was in the public domain, but he nevertheless held that the copyright was infringed. The instant action, of course, presents a closer question since I cannot determine the extent of copying, if any, by a brief examina-

4. Section 24 of the Copyright Act, 17 U.S.C. § 24 provides in pertinent part that:

"... the author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made

to the copyright office and duly registered therein within one year prior to the expiration of the original term of the copyright ..."

5. Plaintiff has observed that *Rohauer* was recently criticized, in *Epoch Producing Corp. v. Killiam Shows, Inc.,* 522 F.2d 737, 746 n.6 (2d Cir. 1975). However, the decision of the Court of Appeals only questions Judge Bauman's conclusion that a renewal copyright is *presumptively* valid. This is not the principle of law for which I have cited it.

tion of the materials in question. Still, as I have noted, *supra,* there is no reason to believe that this action falls outside the holding of *Grove Press* merely because motion pictures are "three-dimensional."

There is also no merit to plaintiff's unsupported contention that the defendants abandoned their copyright interest in the books merely by failing to renew the copyrights in the motion pictures. The defendants concede, as they must, that the motion pictures are no longer protected works. See *Group Publishers v. Winchell,* 86 F.Supp. 573 (S.D.N.Y.1949). The defense of abandonment, however, requires some overt action undertaken by the copyright owner which indicates an intention to dedicate the rights in the work to the public. *National Comic Publications, Inc. v. Fawcett Publications, Inc.,* 191 F.2d 594, 598 (2d Cir. 1951); *Judscott Handprints, Ltd. v. Washington Wall Paper Co.,* 377 F.Supp. 1372, 1378 (E.D.N.Y.1974). Here the motion pictures have fallen into the hands of the public through inaction alone and there has been no abandonment of the renewal copyrights in the novels.

The court concludes therefore that the counterclaim states a cause of action.

Turning to the plaintiff's motion for summary judgment, plaintiff bears the burden of showing that there are no material factual issues presented by the counterclaim. *Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). If reasonable men might disagree as to the material facts, the motion must be denied. *Cali v. Eastern Airlines, Inc.,* 2 Cir., 442 F.2d 65, 71 (1965).

The plaintiff contends that the motion pictures constitute new matter and not potentially infringing derivative works although it concedes that Mulford may have created some of the "literary material" contained within them. The defendants, on the other hand, maintain that each film is based upon a book written by Mulford. Neither side has submitted exhibits which would enable me to determine the degree of similarity between the works, if any, as a matter of law. *See generally Herbert Rosenthal Jewelry Corp. v. Honora Jewelry Co.,* 378 F.Supp. 485, 490 (S.D.N.Y.), *aff'd,* 509 F.2d 64 (2d Cir. 1974). To prevail on their counterclaim, however, the defendants must demonstrate that there is substantial similarity. *Norman v. Columbia Broadcasting System, Inc.,* 333 F.Supp. 788, 795 (S.D. N.Y.1971); 2 Nimmer, *supra,* § 1431. There is therefore a material issue of fact which must await an evidentiary hearing for determination. *Arnstein v. Porter,* 154 F.2d 464, 468 (2d Cir. 1946); *Reyher v. Children's Television Workshop, supra,* 377 F.Supp. at 412.

There is also a question of contract interpretation which must be resolved at a hearing on the merits. The operative words of grant and reservation have been set out earlier in the margin.[6] Plaintiff contends that the reservations of television rights by Mulford referred to future uses of the books and not the motion pictures to be made under the agreements. The defendants maintain that the reservation gives rise to an action for infringement. Although the words of grant are to be construed against the grantor, *Bartsch v. Metro-Goldwin-Mayer, Inc.,* 391 F.2d 150, 155 (2d Cir. 1968), *aff'g* 270 F.Supp. 896 (S.D.N. Y.1967), *cert. denied,* 393 U.S. 826, 89 S.Ct. 86, 21 L.Ed.2d 96 (1968), Mulford did specifically reserve some television rights. Whether the parties intended the reservation to cover plaintiff's proposed activities is a question that must be determined at a later date. At this juncture the court is unwilling to assume that no evidence concerning the intent of the parties will be presented at that time.

The motion for summary judgment on the counterclaim is accordingly denied.

SO ORDERED.