**FILMVIDEO RELEASING CORPORATION,**
**Plaintiff,**

v.

**David R. HASTINGS, II, as Administrator with Will annexed of the Estate of Clarence E. Mulford, Defendant,**

**and**

**David R. Hastings, II, and Peter G. Hastings, as Trustees of the Inter Vivos Trust and of the Testamentary Trust Created by Clarence E. Mulford, Intervenors.**

**No. 75 Civ. 2248 (HFW).**

United States District Court,
S. D. New York.

March 17, 1978.

Howard Gotbetter, New York City, for plaintiff.

Burns, Jackson, Miller, Summit & Jacoby, New York City by Herbert P. Jacoby, New York City, of counsel, for defendant and intervenors.

## OPINION

WERKER, District Judge.

Following a two-day bench trial and certain preliminary rulings, and pursuant to stipulation among the parties, this declaratory judgment action comes before the Court for decision on an issue of contractual interpretation arising out of two agreements, concluded in the 1930s, concerning the right to produce motion pictures based upon copyrighted "Hopalong Cassidy" stories. After careful consideration of all of the testimony and documentary evidence, it is the Court's view that the question raised must be resolved in favor of the defendant and intervenors. The factual findings and legal conclusions upon which this decision is predicated are set forth in the remainder of this opinion as is required by Rule 52(a) of the Federal Rules of Civil Procedure.

During the period from 1907 to 1935, Clarence E. Mulford wrote 23 Hopalong Cassidy books. Each of the books was duly copyrighted and the renewal copyrights in them continue to be effective. The books were all published by Doubleday Page & Company or Doubleday Doran & Company, Inc. ("Doubleday") pursuant to written agreements under which Mulford expressly reserved the "motion picture and dramatic rights" to his literary materials. Doubleday also acted as Mulford's literary agent.

On February 27, 1935, Mulford entered into an option agreement (the "1935 Agreement") under which he granted Prudential Studios Corporation ("Prudential"), in Paragraph One, the right to:

acquire all "sound," musical and talking motion picture rights and the rights to produce, transmit, reproduce, distribute, exhibit and exploit in any manner or by any method or device (except as hereinafter specified) now or hereafter known

or used, motion pictures taken from or based upon [21 books specified in the agreement].

Paragraph One also expressly reserved certain rights as follows:

All rights of production and use upon the spoken stage with living actors appearing and speaking in person in the actual and immediate presence of the audience are specifically reserved to Mr. Mulford.

All television, broadcasting and radio rights are specifically reserved to Mr. Mulford.

And Paragraph Ten of the 1935 Agreement further delineated the scope of Prudential's motion picture rights by providing that:

Prudential may (within the limitations of this agreement) make, exhibit and market everywhere, motion pictures, sound records and stills based upon or adopted from any of the above books in respect to which Prudential has exercised its option using any methods or devices for such purpose which are now or hereafter known or used . . . . .

On July 13, 1938, the 1935 Agreement was supplemented by an agreement (the "1938 Agreement") between Doubleday and Este Productions, Inc. ("Este"), a successor to Prudential. Pursuant to the terms of that instrument, three additional Hopalong Cassidy books were added to the list of those covered by the 1935 Agreement.

Eventually, 23 motion pictures were produced under the terms of the two agreements. Each of the motion pictures was initially copyrighted, but renewal applications were never filed for them and they are consequently no longer subject to copyright protection. It is for this reason that plaintiff seeks a declaratory judgment that it may use without restriction physical negatives of the 23 motion pictures and related materials which are in its possession. In a counterclaim not presently before the Court, defendants seek an injunction restraining plaintiff from using the motion pictures, and damages for copyright infringement.

The controversy arises because plaintiff has licensed and states that it is attempting to issue further licenses to third parties who wish to exhibit the motion pictures on television. At an earlier stage of this lawsuit, plaintiff maintained that this course of conduct was permissible because the motion pictures were not protected by copyrights; however, I rejected that argument in a previous opinion in which it was held that the renewal copyrights in the books could "be infringed by the use of materials in the public domain as readily as they are by the use of separately copyrighted matter." 426 F.Supp. 690, 694 (1976). At trial, plaintiff advanced the alternative theory that it could not have infringed Mulford's interest in the books by exhibiting the motion pictures on television since Mulford had already ceded all necessary rights to third parties pursuant to the terms of the 1935 Agreement as supplemented by the 1938 Agreement. It is the correctness of this contention which is now before me. As the parties have phrased it, the issue is:

> "Did the grantor and grantees [under the two agreements] intend that the reservation of certain television rights by grantor should limit the use for television exhibition of the Hopalong Cassidy films made by such grantees and their assignees?"

Plaintiff's view is that the reservation of "all" television rights for Mulford was meant to apply solely to the terms of the immediately preceding clause of Paragraph One of the 1935 Agreement, dealing with live dramatic productions before an audience, so that Mulford retained only the right to televise live presentations based upon the Hopalong Cassidy stories. The difficulty is that plaintiff's argument, though certainly supported by some of the testimony and other evidence, requires a reading of the 1935 Agreement which is both illogical and contrary to the practical construction given it for nearly four decades. A brief review of some of the evidence adduced at trial will serve to demonstrate this.

Plaintiff's initial witness was Maurice H. Zouary, the President of plaintiff. Zouary testified that he had found diary file cards prepared by Mulford during a search of voluminous materials donated to the Library of Congress by Mulford. Reproductions of certain of those file cards, containing information about the 23 Hopalong Cassidy books involved in this action (and others), were introduced into evidence and indicate, as plaintiff contends, that Mulford was an unusually meticulous record keeper who took care to record many details concerning the writing, editing and subsequent distribution of his stories. It is plaintiff's contention that, in view of this detail, the limited nature of Mulford's television rights can be divined from the fact that Mulford made no mention of them on any of the file cards. However, no such inference can fairly be drawn since the cards are also devoid of any reference to Mulford's clearly reserved dramatic rights or other agreements by which he sought to convey his right to exhibit the motion pictures on television. Certain of these agreements will be considered *infra*.

Plaintiff's second witness was Jack D. Trop who claimed to be the person who negotiated the 1935 Agreement on behalf of Prudential. Trop testified that he first met Daniel W. Nye of Doubleday (Mulford's agent) in the latter half of 1934; that at that first meeting he entered into a letter agreement with Nye giving Trop and his associates an option to acquire the motion picture rights to specified Hopalong Cassidy books at two month intervals upon payment of $2,250 per book; and that the $250 cost of this option was paid immediately so that the concept of making Hopalong Cassidy motion pictures could be revealed at an early date to Paramount Pictures, Inc. ("Paramount"), which had evidently expressed some interest in producing "westerns." Trop testified further that the 1935 Agreement was submitted to him in its present form when he next met with Nye "very shortly" after their first meeting. Trop recalled that he reviewed the 1935 Agreement "carefully" and told Nye that the motion pictures would be shown "all

over the world and through any medium which would be available in the future, particularly television," which he already knew was capable of transmitting "live images" and may have known could transmit motion pictures. Trop did not claim, however, that Nye agreed with this position and conceded that he had signed the 1935 Agreement without seeking any wording changes even though he had read the "within the limitations of this agreement" language of Paragraph Ten of the 1935 Agreement and was "not absolutely satisfied" with it. Indeed, when he was asked if there was any language in the 1935 Agreement which would support his interpretation of Prudential's rights, Trop readily admitted that there was none.

Plaintiff also introduced a number of other instruments signed by Mulford in an effort to show that Mulford's reservation of television rights under the 1935 Agreement was limited solely to television rights to live dramatic productions. These instruments each contain language granting motion picture rights "except as hereinafter specified," however, they differ from the 1935 Agreement in that the discussion of television rights in each instrument (1) is included in the same sentence as the discussion of live dramatic rights and (2) follows directly after it. Typical language is found in a 1937 Agreement (the "1937 Agreement") by which Mulford granted Este an option to make motion pictures based upon Hopalong Cassidy screenplays, provided he was assigned:

all rights of production and use upon the spoken stage, with living actors appearing and speaking in person in the actual and immediate presence of the audience, and all television, broadcasting and radio rights . . . .

In effect, what plaintiff argues is that the use of a conjunction rather than two sentences somehow evidences the contractual intention of the parties. To say the least, I am unable to accept that proposition. In the first place, use of the phrase "all television rights" hardly comports with the notion that only some such rights were

meant to be included. Moreover, as even Trop conceded, Prudential's right to exhibit or exploit the motion pictures "by any method or device" was expressly limited by the parenthetical notation "except as hereinafter specified." Since restrictions on the use of the motion pictures appear only in the reservation clauses of Paragraph One of the 1935 Agreement, the only logical conclusion is that the parties to the instrument intended to prohibit Prudential from making any use of radio or television as a "method or device" by which it could exploit its motion pictures. Such an interpretation also accords with and gives meaning to the language employed in Paragraph Ten of the 1935 Agreement which indicates that Prudential's right to exhibit or market the motion pictures is, in fact, limited.

Perhaps most importantly, plaintiff's suggested interpretation of the reservation of television rights conflicts with the practical construction of the parties to the 1935 Agreement and their successors. For example, on August 17, 1944, Este acquired from Mulford the motion picture rights to a specified number of Hopalong Cassidy screenplays (the "1944 Agreement"). The 1944 Agreement contained language of grant and reservation identical to that found in the 1937 Agreement relied upon by plaintiff, but when Este sold its motion picture rights under the 1944 Agreement to William Boyd, star of the Hopalong Cassidy motion pictures, on November 1, 1975, Harry Sherman, the President of Este, noted in an explanatory letter to Boyd, also dated November 1, 1945, that the "radio and television rights in screenplays acquired under [the provisions of the 1944 Agreement] were reserved to Mr. Mulford, and [that] Este . . . now asserts no claim to such radio or television rights. Furthermore, Boyd apparently shared Sherman's view of the scope of Este's motion picture rights. After acquiring all of Este's rights under the 1944 Agreement, Boyd proceeded to negotiate additional rights to the Hopalong Cassidy motion pictures, culminating in a 1947 "Television Rights Agreement" with Mulford and Doubleday who licensed him for a period of two years to exploit the

television rights in both the Hopalong Cassidy books and the Hopalong Cassidy motion pictures. In that agreement, Mulford and Doubleday unambiguously warranted that they were "the sole owners of all the television rights in and to all Hopalong Cassidy motion pictures which have been produced to date."

The Boyd license was subsequently extended by letter agreements through December 31, 1978, and, according to Marguerite Cherry, Boyd's business manager, led to the airing of Hopalong Cassidy motion pictures on the NBC Network from approximately 1949 to 1973. Yet, although television royalties were paid to the Mulford Trust throughout this entire period, no claims to these royalties, or to the underlying television rights for that matter, were ever asserted by Sherman, Prudential, Paramount or Este, who clearly would have had an economic interest in doing so. Several purchasers of motion picture rights in the Hopalong Cassidy properties also took care to note in subsequent conveyances that they were not purporting to sell any of Mulford's retained rights in the motion pictures, a precaution which would not have been necessary if Mulford had no such rights.

Finally, despite this consistent course of conduct, plaintiff maintains that Mulford's intent to relinquish all motion picture rights can be inferred from his failure to insist upon contractual provisions giving him access to copies of the motion pictures. While it is true that Mulford's television rights might have necessarily remained inchoate if he did not possess either negative or positive copies of the motion pictures, it does not necessarily follow that he had no desire to reserve them. Rather, as Doubleday's attorney, who was a witness at trial, recognized in a 1949 letter, it merely meant that Mulford could not "obtain the fruits of his television rights" without the consent of others.

Accordingly, I find that Mulford and Prudential intended that Mulford retain all conceivable television rights in the Hopalong Cassidy motion pictures.

The parties are directed to confer within the next twenty days in an effort to agree upon the terms of an order in accordance with this opinion. Should agreement prove impossible, defendant and intervenors are to settle an order on notice within ten days after the close of the twenty day period.

SO ORDERED.