612 F.2d 1123
 205 U.S.P.Q. 206, 1978-81 Copr.L.Dec. 25,125
 Cyril RUSSELL, etc., et al., Plaintiffs/Appellees,
v.
Daniel A. PRICE et al., Defendants,
and
Albert C. Drebin, etc., Defendants/Appellants.
Cyril RUSSELL, etc., et al., Plaintiffs/Appellants,
v.
Daniel A. PRICE et al., Defendants,
and
Albert C. Drebin et al., Defendants/Appellees.
Cyril RUSSELL, etc., et al., Plaintiffs/Appellees,
v.
Daniel A. PRICE et al., Defendants,
and
Albert C. Drebin, etc., et al., Defendants/Appellants.
 Nos. 77-3466, 78-2703 and 78-2763.
 United States Court of Appeals,
Ninth Circuit.
 Dec. 18, 1979.
Rehearing Denied Feb. 19, 1980.
 
 Gerald M. Singer, Los Angeles, Cal., for defendants-appellants.
 Mitchell N. Reinis, Katz, Hoyt & Bell, Los Angeles, Cal., for plaintiffs-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before GOODWIN and HUG, Circuit Judges, and THOMPSON*, District Judge.
 GOODWIN, Circuit Judge:
 
 
 1
 Defendants distributed copies of the film "Pygmalion", the copyright for which had expired. They were sued by the owners of the renewal copyright in the George Bernard Shaw play upon which the film was based. Defendants appeal the resulting judgment for damages and attorney fees.
 
 
 2
 Plaintiffs cross appeal, claiming that the court erred in not awarding them statutory "in lieu" damages.[1] We affirm.
 
 
 3
 In 1913 Shaw registered a copyright on his stage play "Pygmalion". The renewal copyright on the play, obtained in 1941 and originally scheduled to expire in 1969, was extended by Congressional action to the year 1988. Shaw died in 1950 and the plaintiffs, except for Janus Films, are current proprietors of the copyright. Janus Films is a licensee.
 
 
 4
 In 1938 a derivative version of the play, a motion picture also entitled "Pygmalion", was produced under a license from Shaw; neither the terms nor the licensee's identity appear in the record.[2] The film was produced by Gabriel Pascal, copyrighted by Loew's, and distributed by Metro-Goldwyn-Mayer ("MGM"). For undisclosed reasons, the film's copyright was allowed to expire in 1966. When and if the original film rights agreement expired is also not disclosed.[3]
 
 
 5
 In 1971 the play's copyright proprietors licensed Janus Films to be the exclusive distributor of the film "Pygmalion". Shortly after discovering in 1972 that Budget Films was renting out copies of the 1938 film,[4] Janus brought action against Budget in a California state court, alleging state causes of action in particular, unfair competition. That case ended in Budget's favor upon a determination that the action was essentially one for copyright infringement over which the state court lacked jurisdiction. The English copyright proprietors then executed a power of attorney in favor of their licensee Janus, and Janus[5] promptly brought this action in federal district court in May 1975.
 
 I. LACHES
 
 6
 The defendants contend that the doctrine of laches barred the infringement action. The question of laches is addressed primarily to the discretion of the district court. Gardner v. Panama Railroad Co., 342 U.S. 29, 30, 72 S.Ct. 12, 96 L.Ed. 31 (1951); International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp., 518 F.2d 913, 926 (9th Cir. 1975). Rejection of the laches defense in this case was not an abuse of discretion.
 
 
 7
 Although proceeding on a different theory at the time, Janus instituted state court proceedings shortly after it learned that Budget was renting out the film "Pygmalion". Thus, defendants had early notice that their activities were objected to on legal grounds. But they claim that Janus misled them and the state court for two and a half years by steadfastly refusing to acknowledge the copyright nature of the action so as to keep it in state court, and that the other plaintiffs sat back on their copyright claim all that while, choosing instead to see how Janus would fare in the California courts. Only when the state court action was dismissed on the ground that the action was in fact one for infringement of copyright rather than for unfair competition did the plaintiffs file the present copyright action. Meanwhile, the defendants complain that they had incurred unnecessary expenses in the state litigation and had been falsely reinforced in their belief that no valid copyright protected the playwriter's rights in the film "Pygmalion" on which the film copyright had expired.
 
 
 8
 Even if the plaintiffs had followed the strategy alleged, and if it somehow offends equity,[6] as defendants insist, the detriment Budget claims to have suffered as a result of plaintiffs' delay in bringing this action does not constitute prejudice within the meaning of the laches doctrine. Defendants at no time changed their film distribution activities in reliance on Janus' conduct. Defendants cite no case in which a false sense of security alone has been enough to bar an otherwise proper claim.[7] Nor were the expenses and difficulties of the earlier litigation incurred in reliance on plaintiffs' inaction. If plaintiffs had proceeded in both state and federal courts simultaneously, defendants would have been in no better position. This is not a case where copyright holders speculated on the probable success of a costly but unauthorized exploitation of a work before asserting their rights in it. See Hampton v. Paramount Pictures Corp., 279 F.2d 100, 105 (9th Cir.), Cert. denied, 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960)[8]; Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354, 372 (9th Cir. 1947). In fact, the copyright proprietors here knew the value of their property and were themselves exploiting it through the licensing arrangement with Janus. The laches defense was properly rejected.
 
 II. INFRINGEMENT
 
 9
 Defendants' main contention on the primary issue in this litigation is simply stated: Because the film copyright on "Pygmalion" has expired, that film is in the public domain, and, consequently, prints of that film[9] may be used freely by anyone. Thus, they argue that their renting out of the film does not infringe the statutory copyright on Shaw's play.
 
 
 10
 Defendants rely almost entirely on the recent opinion of Judge Friendly in Rohauer v. Killiam Shows, Inc., 551 F.2d 484 (2d Cir.), Cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). However, in so relying, they ignore or fail to appreciate the significant differences between that case and this one.[10]
 
 
 11
 In Rohauer the author of a novel which was statutorily copyrighted in 1925 assigned exclusive movie rights to one Moskowitz, specifically promising in the contract to reassign to him or his successor in interest all film rights for the novel's copyright renewal term. A successful silent film was made under that assignment and separately copyrighted in 1926 by an assignee of Moskowitz. Unfortunately, the novel's author died prior to the end of the novel's first copyright term. The author's daughter, as statutory beneficiary of the right to renew, inherited the renewal term free from the film license granted by her mother.[11] The daughter then granted exclusive movie and television rights for the renewal term to Rohauer. Killiam Shows, Inc., successor in interest to the 1926 film's renewal copyright, allowed the film to be shown on educational television without Rohauer's or the daughter's authorization, whereupon the latter two brought a copyright infringement action against Killiam.
 
 
 12
 The Second Circuit held on those facts that the derivative film's independent copyright entitled the defendant to continue showing the film without infringing rights under the renewal copyright in the underlying novel. Defendants here understand by this that a derivative copyright covers more than the new matter which the producer of the derivative work added to the underlying work. Thus, they say that when the derivative copyright expires the whole product enters the public domain free of the monopoly protection of any subsisting copyright in the underlying work. The court's opinion in Rohauer, however, makes it clear that this is simply not the case.
 
 
 13
 First, the Rohauer court placed heavy emphasis on the nongratuitous intent of the nonsurviving author to convey film rights in the novel's renewal term, a promise which had been bargained for in the initial assignment.[12] The defendants here have never bargained with Shaw or his successors for anything, nor do they enjoy any relationship with anyone who had so bargained.
 
 
 14
 A second important difference between the favored party in Rohauer and the defendants here is that the defendant Killiam there was the proprietor of the still valid copyright in the film. By virtue of that copyright, Killiam was held to have sufficient rights in the matter derived from the novel to continue showing it as part of the film.[13] A prominent rationale in that case for awarding those limited rights in favor of the owner of the derivative copyright is the protection and encouragement of the "large and independently copyrightable" "literary, musical and economic" contributions of the "person who with the consent of the author has created an opera or a motion picture film" from a copyrighted novel. 551 F.2d at 493. However, whatever place sympathy for the position of creators of derivative works might properly have under the 1909 Copyright Act,[14] the defendants here can take advantage of none, having contributed nothing to the production of the film "Pygmalion".
 
 
 15
 Nor is it apparent under Rohauer that such sympathy should have any place at all when the independent copyright on the derivative work has been allowed to expire. For then there is no longer a conflict between two copyrights, each apparently granting "their proprietors overlapping 'exclusive' rights to use whatever underlying material * * * had been incorporated into the derivative film." Comment, Derivative Copyright and the 1909 Act New Clarity or Confusion?, 44 Brooklyn L.Rev. 905, 912 (1978) (footnote omitted). Thus, the persons who might have had standing to raise the Rohauer claim here could, consistently with that case, be held to have forfeited it by their failure to renew the derivative copyright. Defendants here could never have laid claim to the right recognized in Rohauer, and we perceive no reason to award it to them at the expense of the holders of the renewal copyright which still covers the Shaw play.
 
 
 16
 Thus, we reaffirm, without finding it necessary to repeat the rationale, the well-established doctrine that a derivative copyright protects[15] only the new material contained in the derivative work, not the matter derived from the underlying work. 1 Nimmer on Copyright § 3.04 (1979). Thus, although the derivative work may enter the public domain, the matter contained therein which derives from a work still covered by statutory copyright is not dedicated to the public. G. Ricordi & Co. v. Paramount Pictures, Inc., 189 F.2d 469 (2d Cir.), Cert. denied, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951); Filmvideo Releasing Corp. v. Hastings, 426 F.Supp. 690 (S.D.N.Y.1976); Grove Press, Inc. v. Greenleaf Publishing Co., 247 F.Supp. 518 (E.D.N.Y.1965); 1 Nimmer on Copyright § 3.07(C) at 334 (1979). The established doctrine prevents unauthorized copying or other infringing[16] use of the underlying work or any part of that work contained in the derivative product so long as the underlying work itself remains copyrighted. Therefore, since exhibition of the film "Pygmalion" necessarily involves exhibition of parts of Shaw's play, which is still copyrighted, plaintiffs here may prevent defendants from renting the film for exhibition without their authorization.
 
 
 17
 Defendants seek finally to avoid this result by citing Classic Film Museum, Inc. v. Warner Bros., Inc., 597 F.2d 13 (1st Cir. 1979), Aff'g 453 F.Supp. 852 (D.Me.1978). That decision concerned "the legal effect of an expired statutory copyright on work derived from an underlying work in which there exists a common-law copyright". 597 F.2d at 13. Although defendants would have us ignore the major difference between an underlying common-law copyright and an underlying statutory copyright (the former extending in perpetuity,[17] the latter restricted in length) that difference is the linchpin of the court's holding in Classic Film that a person could exhibit the motion picture "A Star is Born", on which the film copyright had expired, without infringing the common-law copyright in the unpublished screenplay and musical score from which the film was derived. The court found the Ricordi doctrine inapplicable for the following reason:
 
 
 18
 " * * * (A)ny protection offered by the Ricordi doctrine was limited to the fixed life of the underlying copyright (28 years plus the renewal period). The Ricordi doctrine is not equally applicable where there is an underlying common-law copyright which might extend indefinitely. Such unending protection of the derivative work would allow the Ricordi exception to swallow the rule of limited monopoly found in the constitution and copyright statutes." 597 F.2d at 14.
 
 
 19
 The underlying statutory copyright in the instant case will expire in 1988. After that time Budget may freely distribute its copies of the 1938 film. The result we reach here does not conflict with the limited monopoly policy rooted in the Copyrights Clause of the constitution and advanced in the congressional acts.
 
 
 20
 For the foregoing reasons, we conclude that defendants' activities here infringed the subsisting copyright in Shaw's play and were properly enjoined.
 
 III. DAMAGES
 
 21
 On cross-appeal plaintiffs contest on two grounds the award of $3,700 in damages, which was the calculated estimate of Budget's gross receipts from its rental of "Pygmalion" from May 1972 to December 1977. Plaintiffs argue, first, that statutory "in lieu" damages[18] are mandatory in this situation; and, second, that if statutory damages are not mandatory then the district court abused its discretion in limiting damages to the infringer's gross profits in this case. We reject both contentions.
 
 
 22
 It is true that when injury is proved but neither the infringer's profits nor the copyright holder's actual damages can be proved, statutory damages are mandatory. See Pye v. Mitchell, 574 F.2d 476, 481 (9th Cir. 1978); Robert Stigwood Group LTD v. O'Reilly, 530 F.2d 1096, 1101 (2d Cir.), Cert. denied, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976); 4 Nimmer on Copyright, App. 16-4 (1979). In addition, some of the dicta in Shapiro, Bernstein & Co. v. 4636 S. Vermont Ave., Inc., 367 F.2d 236 (9th Cir. 1966),[19] might lead one to conclude that "in lieu" damages are also mandatory when either profits or damages but not both are proved. This circuit recently examined at length the meaning of the Shapiro dicta in light of F. W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 73 S.Ct. 222, 97 L.Ed. 276 (1952).[20] We concluded that, contrary to initial appearances, Shapiro in fact means that "in lieu" damages are mandatory "only when Both profits and damages have not been established." Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp., 562 F.2d 1157, 1178 (9th Cir. 1977). It is not necessary to repeat that analysis here.
 
 
 23
 In Krofft, the jury had assessed plaintiffs' actual damages at $50,000, an amount not reflecting consideration of the infringer's profits. The district judge subsequently denied plaintiffs' motion for an accounting of defendant's profits and awarded the compensatory damages only. Our court's remand order on the issue is instructive of the law in this circuit regarding infringement damages and in particular court discretion in that regard:
 
 
 24
 "On remand the trial court's first task is to determine, if possible, the profits of the infringers. If these profits are ascertainable, then plaintiffs are entitled to the larger of either the profits or damages, unless the district court, in its discretion, awards the statutory 'in lieu' damages. If the profits are not ascertainable, then plaintiffs are entitled to the compensatory damages as found by the jury, unless the district court awards the discretionary 'in lieu' damages." 562 F.2d at 1179.
 
 
 25
 While it was unnecessary in Krofft to instruct for the situation where damages are unascertainable while profits are ascertained, the situation facing us, we see no reason for holding, asymmetrically, that in lieu damages would be mandatory in that situation rather than discretionary. Accord, F. W. Woolworth Co. v. Contemporary Arts, Inc., supra.
 
 
 26
 Plaintiffs in the instant action seek to bring their situation under the mandatory statutory damage rule by showing that the district court found that neither actual damages nor infringer's profits were ascertainable. It is undisputed that plaintiffs' actual damages are unascertainable.[21] Plaintiffs then point to the court's finding of fact that Budget's "actual profits on the use of PYGMALION are not ascertainable" as compelling an award of in lieu damages in accord with the preceding rule of law. But they take the judge's words too literally and out of context. Finding (4) continues: "defendants' gross receipts are ascertainable with reasonable certainty," and finding (7) adopts those receipts as "the actual amount of the defendants' profits." These latter findings comport with the district court's earlier memorandum opinion on the damages issue.
 
 
 27
 Plaintiffs' confusion stems in part from the meaning of the term "actual profits". It is clear from a reading of the statute[22] that the infringer's profits to which the copyright proprietor may be entitled consist of the gross receipts or sale profits from the infringing use of the plaintiff's work, which is the plaintiff's burden to establish, less any direct costs incurred by the defendant in connection with the unauthorized use, on which the latter party bears the burden of proof. If an infringer does not assume this burden or if its attempt to do so is found unacceptable by the court, as was the case here, then "the gross figure is left to stand as the profit factor" under 17 U.S.C. § 101(b). F. W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. at 230, 73 S.Ct. 222. Plaintiffs in such a situation gain the advantage of a higher profit figure than would otherwise occur, although they may also discover that they would have fared better in the long run if the court had deemed the profits unascertainable. To achieve the results plaintiffs here desire, they assail the method the district court used to calculate the gross receipts figure.
 
 
 28
 In order to avoid laborious search of defendants' records, plaintiffs stipulated to estimates of the number of unauthorized bookings made by Budget of the film "Pygmalion". The figures totalled 136 bookings. In the stipulation, which was filed with the court on January 18, 1978, plaintiffs agreed that the booking figures "may be used by the Court * * * on the remaining issues," primary of which was the issue of damages. Contained within the document but not stipulated to by the plaintiffs was a representation by defendants of their rental charges for the film per booking: $25 from May 1972 to October 1976, and $35 thereafter. The court eventually[23] used these rental figures to calculate defendants' gross receipts for the stipulated bookings, each of which was found to constitute a separate infringement, to arrive at a total of $3,700. Plaintiffs contend that, since they had not agreed to the rental amounts, as opposed to the bookings figures, the court erred in basing the gross receipts upon them. We cannot agree. The rental figures were identical to those that were advertised in Budget's catalogs for "Pygmalion". Plaintiffs have presented no reason to doubt their accuracy, and no contradictory evidence.[24] We think the district court's utilization of those figures was reasonable under the circumstances. Thus, we find that the profits figure yielded by the court's calculation was sufficiently certain to preclude applicability of the mandatory in lieu damages rule.
 
 
 29
 Plaintiffs next argue that the district court abused its discretion by awarding them the infringers' profits of $3,700 rather than statutory damages which at a minimum would amount to $34,000. They rely in part on Sid and Marty Krofft Television Productions, Inc. v. McDonald's Corp., supra, as supporting the proposition that the court must weigh statutory damages against infringers' profits and award the higher sum. However, what was said in Krofft was not that in lieu damages must be given if they benefit, but that they must not be given if they hurt plaintiffs. 562 F.2d at 1178-79 n. 7.
 
 
 30
 The cases cited by plaintiffs as affirming a discretionary award of statutory damages involved rejections by district courts of De minimis profits of the infringers as an alternative basis of recovery. F. W. Woolworth Co. v. Contemporary Arts, Inc., supra (gross profits under $900); Key West Hand Print Fabrics, Inc. v. Servin, Inc., 269 F.Supp. 605, 615 (S.D.Fla.1966) (infringer made no profit), Aff'd, 381 F.2d 735 (5th Cir. 1967). The courts there had every reason to award higher compensation for the plaintiffs' substantial but unprovable damage than what the defendants had realized from their infringing activity. We are not faced with a similar situation in this case. The gross profits figure here can hardly be described as De minimis. We think the amount sufficient "to discourage wrongful conduct" without necessitating resort to in lieu damages to effectuate that purpose of copyright policy. Woolworth, 344 U.S. at 233, 73 S.Ct. 222.[25] We find no abuse of discretion and consequently affirm the damage award.
 
 IV. ATTORNEYS' FEES
 
 31
 The copyright statute authorizes the district court in the exercise of its discretion to award reasonable attorneys' fees to the prevailing party. 17 U.S.C. § 116. This court could reverse an order allowing such fees only for abuse of discretion. See Monogram Models, Inc. v. Industo Motive Corp., 492 F.2d 1281, 1288 (6th Cir.), Cert. denied, 419 U.S. 843, 95 S.Ct. 76, 42 L.Ed.2d 71 (1974). While the $10,000 awarded plaintiffs in fees might be considered generous when compared with the amount recovered in damages, the fees do not appear unreasonable considering the amount of work necessitated and performed and the skill employed. See also Key West Hand Print Fabrics, 269 F.Supp. at 615-16. There was no abuse here.
 
 
 32
 However, we deny plaintiffs' application for allowance of additional attorneys' fees on appeal. We assume counsel was familiar with the law, having made similar arguments in district court on all the issues raised on appeal. See Monogram Models, 492 F.2d at 1288. The appeal was not frivolous. Plaintiffs did not prevail on their cross appeal. Equity considerations lead us to permit the parties to pay their own attorneys' fees in this court. The plaintiffs are entitled to costs.
 
 
 33
 Affirmed.
 
 
 
 *
 The Honorable Gordon Thompson, Jr., United States District Judge for the Southern District of California, sitting by designation
 
 
 [1]
 Defendants had also challenged in their notice of appeal the damages portion of the judgment. They argued that the district court should have assessed as damages their self-calculated and unverified net profits rather than the gross receipts they had initially estimated. This theory did not survive oral argument when counsel conceded that the court's choice of the measure of damages was well within its discretion
 
 
 [2]
 In their initial brief on appeal, plaintiffs cite Speelman v. Pascal, 10 N.Y.2d 313, 222 N.Y.S.2d 324, 326, 178 N.E.2d 723, 724 (1961), to support their statement that it was Gabriel Pascal who obtained the movie rights under an agreement with Shaw
 
 
 [3]
 Defendants make much of the failure to bring the original license terms before the trial court, questioning the right of the play's copyright holders in 1971 to license anyone as the exclusive distributor of the film. However, we fail to see how a question about the enforceability of Janus' distribution contract which is not an issue in this case enhances defendants' position here. Defendants neither stand in the shoes of, nor are in privity with, anyone else, such as Pascal's legatees, MGM, or Loew's, who might arguably still enjoy some right of distribution
 
 
 [4]
 The source of the "Pygmalion" film prints which Budget rents was not before the trial court and is not relevant to our consideration of this case. We assume that Budget lawfully, apart from copyright considerations, acquired the prints it has distributed
 
 
 [5]
 The English copyright holders are also named as plaintiffs in this action but Janus appears to be the real party in interest
 
 
 [6]
 We are not aware of enough of the facts surrounding the earlier litigation to criticize what plaintiffs have done. However, Janus cannot be said to have lacked diligence in seeking a remedy or to have acquiesced in any way in the alleged wrong. Gilliam v. American Broadcasting Cos., Inc., 538 F.2d 14, 25 (2d Cir. 1976); Southern Pacific Co. v. Bogert, 250 U.S. 483, 488-90, 39 S.Ct. 533, 63 L.Ed. 1099 (1919). In Southern Pacific, minority shareholders finally hit upon a successful remedy twenty-two years after the majority's reorganization agreement which cut the minority out of its share of the profits. Laches was held not to bar the action to impose a constructive trust even though plaintiffs' earlier position in its many unsuccessful court attempts might have been justifiably viewed as incompatible with the later assertion of a trust relationship. (See McReynolds, J., dissenting, 250 U.S. at 500, 39 S.Ct. 533.)
 Janus filed the instant copyright action promptly after dismissal of its state suit and its receipt of power of attorney from the copyright proprietors. The two actions are not inconsistent. As the holder of an exclusive license from the copyright proprietors, who are joined in this action solely for standing purposes, Janus has been and remains the only interested person from the time it first discovered Budget's distribution of the film. And it has "ever since * * * persisted in the diligent pursuit of a remedy * * * ." Southern Pacific Co. v. Bogert, 250 U.S. at 489, 39 S.Ct. at 536.
 
 
 [7]
 We cannot help but doubt defendants' claimed "sense of security". They caused the state case to be dismissed precisely because they believed it to be a disguised copyright action
 
 
 [8]
 Even in Hampton, where plaintiff copyright holders delayed thirteen years after the infringer's commercial exhibition of the film before taking Any legal action, laches did not bar an injunction against future unauthorized use. Hampton v. Paramount Pictures Corp., 279 F.2d 100, 105 (9th Cir.), Cert. denied, 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960)
 
 
 [9]
 Defendants admit that any new motion picture or other derivative work produced without the permission of the proprietors of the copyright on Shaw's play would infringe that underlying copyright
 
 
 [10]
 We express no opinion about the merits of Rohauer v. Killiam Shows, Inc., 551 F.2d 484 (2d Cir.), Cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977), which has been the subject of adverse critical commentary. See 1 Nimmer on Copyright § 3.07(A) at 3-25-3-32 (1979); Comment, Derivative Copyright and the 1909 Act New Clarity or Confusion?, 44 Brooklyn L.Rev. 905 (1978)
 
 
 [11]
 The optional renewal term under the Copyright Act of 1909, 17 U.S.C. § 24 (1976), was considered to be a "new estate", so that the proprietor of the renewal term copyright could exploit it free of any rights, interests or licenses assigned or made during the copyright's initial term. See, e. g., G. Ricordi & Co. v. Paramount Pictures, Inc., 189 F.2d 469, 471 (2d Cir.), Cert. denied, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951); Miller Music Corp. v. Daniels, Inc., 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed.2d 804 (1960)
 
 
 [12]
 It is on this basis that the court in Rohauer v. Killiam Shows, Inc., supra note 10, distinguished Ricordi, supra note 11, and Fitch v. Shubert, 20 F.Supp. 314 (S.D.N.Y.1937). Rohauer, 551 F.2d at 490-91. The court noted, for example, that the "fundamental reason" Ricordi's holding, that the renewal copyright in the derivative work extended only to the new matter in that version, was not determinative in Rohauer was that in the former the assignment agreement
 " * * * did not purport to run beyond the original term of (the) copyright on the novel * * * . To conclude that the renewal term of a copyright is a new estate free from previous licenses is one thing when, as in Ricordi, the parties have never bargained for renewal rights, and another when, as in the (Rohauer ) case * * * , the assignment agreement explicitly included rights to the derivative work during the renewal term." 551 F.2d at 491.
 
 
 [13]
 We note that the so-called "new property rights" theory which Rohauer v. Killiam Shows, Inc., supra note 10, seems partially to adopt, had been consistently rejected in earlier decisions as well as by the nation's foremost authority on copyright law. G. Ricordi & Co. v. Paramount Pictures, Inc., supra note 11; Fitch v. Shubert, supra note 12; Gilliam v. American Broadcasting Cos., Inc., supra note 6; 1 Nimmer on Copyright § 3.07(A) at 3.23-24 (1979). See also Comment, Supra note 10, at 921-26. Professor Nimmer states the theory as follows:
 " * * * (O)nce a derivative work is created pursuant to a valid license to use the underlying material, a new property right springs into existence with respect to the entire derivative work, so that even if the license is thereafter terminated the proprietor of the derivative work may nevertheless continue to use the material from the underlying work as contained in the derivative work." § 3.07(A) at 3.23 (footnotes omitted).
 
 
 [14]
 This case arose under the Copyright Act of Mar. 4, 1909, codified at 17 U.S.C. §§ 1-216 (1976). Thus, all references are to that version of the copyright statute unless otherwise noted
 In 1976 the 1909 Act was revised in its entirety, superseded by the Copyright Act of Oct. 19, 1976, now codified at 17 U.S.C. §§ 101-810 (Supp.1977), which became wholly effective as of Jan. 1, 1978. In contrast to the earlier act, the 1976 Copyright Act expressly allows use of derivative works "under the terms of the grant" upon termination of the license under which they were produced. 17 U.S.C. § 203(b)(1) (Supp.1977). Although inapplicable to the case before him, Judge Friendly took this to be "evidence for a belief on the part of Congress of the need for special protection for derivative works." Rohauer v. Killiam Shows, Inc., 551 F.2d at 494.
 
 
 [15]
 It is not at all apparent that the Second Circuit would allow its holding in Rohauer v. Killiam Shows, Inc., to extend the limited monopoly permitted by the underlying copyright despite the fear expressed in the student comment, Supra note 10, at 921. The protection advanced in that case was no doubt limited to the derivative copyright owner's continued use of the derivative work, and not the right to prevent others from using the underlying work once that work falls into the public domain
 
 
 [16]
 A copyright proprietor has an exclusive monopoly over All uses of the protected work, including the right to copy, print, vend, publish, make other versions of, perform or exhibit the work. 17 U.S.C. § 1. Thus, we find Judge Friendly's attempt to limit G. Ricordi & Co. v. Paramount Pictures, Inc., supra note 11, to its specific facts unconvincing. Rohauer v. Killiam Shows, Inc., 551 F.2d at 493. The 1909 Act made no distinction between a copyright owner's right to authorize copying or exhibition of the work as it appears in an existing derivative work and the right to authorize creation of a new derivative work. Nor did the court in a case involving essentially the same question as that which confronts us. Filmvideo Releasing Corp. v. Hastings, 426 F.Supp. 690 (S.D.N.Y.1976)
 
 
 [17]
 A common-law copyright, which exists from the time the original work is created, was lost only upon the proprietor's publication of the matter protected. 1 Nimmer on Copyright § 2.02 at 2.16 (1979). Common-law copyright is no longer recognized under the new Act, 17 U.S.C. § 301 (1978), although one existing prior to January 1, 1978 may continue to receive lengthy protection. 17 U.S.C. §§ 303, 302 (1978). See, e. g., Classic Film Museum, 453 F.Supp. at 856 n. 4
 
 
 [18]
 17 U.S.C. § 101(b) provides in part that a copyright infringer shall be liable to pay:
 " * * * such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement, and in proving profits the plaintiff shall be required to prove sales only, and the defendant shall be required to prove every element of cost which he claims, or in lieu of actual damages and profits, such damages as to the court shall appear to be just, and in assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated, * * * and such damages as shall in no other case exceed the sum of $5,000 nor be less than the sum of $250, and shall not be regarded as a penalty."
 
 
 [19]
 "(J)udicial discretion * * * only comes into play when profits And damages have actually been proved, and unless they have, the court Must apply the statutory standard. * * * Where (actual) damages and profits have not been proved the statutory limits must be applied and the trial court's only discretion lies in determining the amount (between a minimum of $250 and a maximum of $5,000) per infringement to be awarded." Shapiro, Bernstein & Co. v. 4636 S. Vermont Ave., Inc., 367 F.2d 236, 240
 
 
 [20]
 The Court in Woolworth affirmed a Discretionary award of in lieu damages in a situation where profits but not damages were ascertained. Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp., 562 F.2d 1157, 1178 (9th Cir. 1977). That the choice of statutory damages in the Woolworth situation clearly lay within the discretion of the court cannot be mistaken from even a cursory reading of the opinion. F. W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 231-34, 73 S.Ct. 222, 97 L.Ed. 276 (1952)
 
 
 [21]
 Janus' actual damages are apparently unascertainable for several reasons. There is no way of knowing whether Budget's customers could afford to rent the film from Janus at the latter's higher price. There is harm to the authorized distributor's reputation inasmuch as its right to exclusive distribution becomes challenged by its own customers in the face of Budget's catalog. In addition, it is alleged that Budget's advertising of "Pygmalion" has led to the unauthorized use of the film by cable and small television stations. We offer no opinion as to the propriety of including all these factors in calculating compensable damages
 
 
 [22]
 See supra note 18
 
 
 [23]
 After the filing of the stipulation, the court ordered the parties to conduct any discovery necessary to assist the court in calculating the infringers' profits according to the following formula: the product of the number of bookings and the average rental fees per booking, less defendants' deductible costs. Defendants maintain that in compliance they conducted an exhaustive inspection of their records, which plaintiffs were welcome to, but did not, verify independently. This inspection apparently yielded a minimal profits figure, less costs, of $153.96. Armed with the information that the stipulated bookings figure was overestimated, defendants sought to withdraw the stipulation unilaterally. This attempt was unsuccessful. The court rejected their figures, including their cost calculations, and, looking anew at the stipulation, found that it had provided the information needed to measure defendants' gross receipts. Defendants no longer challenge the court's calculation of damages. This was probably a wise concession. Were we to agree with defendants' earlier argument, we would have to remand and the district court might then properly and understandably exercise its discretion to award in lieu damages rather than to limit plaintiffs' recovery to the claimed De minimis profits. See F. W. Woolworth, Inc. v. Contemporary Arts, Inc., supra note 20
 
 
 [24]
 If anything, it is more reasonable to suppose that the film occasionally may have been rented at a discounted price, for example, as part of a package deal, then to suppose it was ever rented at a price exceeding the listed catalog price
 
 
 [25]
 The award of $10,000 in attorneys' fees here no doubt provides additional deterrence to would-be infringers